**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**David Joseph HOGENTOGLER,**
**Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 21, 2012.

Filed Sept. 11, 2012.

Andrea L. Haynes, Harrisburg, for appellant.

Jason E. McMurry, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, J., and GANTMAN, J.

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Dauphin County following Appellant's conviction by a jury on the charge of failure to comply with registration of sexual offenders requirements, 18 Pa.C.S.A. § 4915(a)(1). Appellant contends (1) the evidence was insufficient to sustain his conviction, (2) the trial court erred in denying his motion for a directed verdict/mistrial due to a prejudicial comment made during the prosecutor's closing argument, and (3) the trial court erred in overruling Appellant's objection to the trial judge's questioning of Parole Agent Larry Eddie Smith, Jr., as to the differences between parole and probation.[1] We affirm.

The relevant facts and procedural history are as follows: In 1995, Appellant was convicted of, *inter alia*, involuntary deviate sexual intercourse with his then six-year-old nephew, and he was sentenced to an aggregate of ten years to twenty years in prison. N.T. 12/7/11 at 300. At some point, Appellant was placed on parole with regard to his sex crimes, and *inter alia*, he was required to notify the state police within forty-eight hours of any changes in his residence. N.T. 12/6/11 at 70–71. Concluding Appellant failed to meet this requirement, he was charged with violating 18 Pa.C.S.A. § 4915(a)(1), and on De-

---

1. We have renumbered Appellant's issues.

cember 6, 2011, Appellant proceeded to a jury trial with regard to the charge.[2] At trial, Parole Agent Leitzel testified that, beginning in 2009, she supervised Appellant while he was on parole, and she explained to him the various conditions of his parole, including the fact he was to report to her, within 48 hours, any changes in his address. N.T. 12/6/11 at 107–108. Parole Agent Leitzel additionally informed Appellant he was required to report to her at the parole office on the second Wednesday of every month between 8:30 a.m. and 4:30 p.m., and on April 28, 2010, Appellant signed a document acknowledging this specific reporting requirement. N.T. 12/6/11 at 93–95. As of April 28, 2010, Appellant had an approved residence of 203 State Street, Harrisburg, PA, which was a rooming house. N.T. 12/6/11 at 95. In addition to Appellant reporting to the parole office once a month as indicated *supra*, Parole Agent Leitzel randomly checked in on Appellant at the 203 State Street address. N.T. 12/6/11 at 97. Appellant's room at this residence consisted of a small refrigerator, dresser, television, clothes, basic toiletries, books, and paperwork. N.T. 12/6/11 at 98–99. Prior to October of 2010, Appellant's room looked "like he was living there." N.T. 12/6/11 at 99.

On November 10, 2010, Appellant failed to report for his monthly mandatory meeting at the parole office, and therefore, on November 15, 2010, Parole Agent Leitzel went to the 203 State Street address to look for him. N.T. 12/6/11 at 99. Using a key provided to her by the landlord, Parole Agent Leitzel went inside of Appellant's room and discovered he was not inside. N.T. 12/6/11 at 102. She also discovered that the room had "a lot less items

in it" than it had on her previous visits. N.T. 12/6/11 at 102. Specifically, as of November 15, 2010, there was "only a couple pieces of clothing left in the room," and she observed no toiletries. N.T. 12/6/11 at 103. In fact, Parole Agent Leitzel testified she observed no articles of daily living in Appellant's room on November 15, 2010. N.T. 12/6/11 at 104. After her inspection, Parole Agent Leitzel left on the door of Appellant's room a bright yellow set of mandatory reporting instructions, which directed Appellant to report to her at the parole office on November 16, 2010. N.T. 12/6/11 at 101, 105.

On November 16, 2010, Appellant failed to appear at the parole office, and therefore, Parole Agent Leitzel went back to Appellant's room at 203 State Street. N.T. 12/6/11 at 105–106. Appellant was not at the rooming house, and the bright yellow reporting instructions remained on the door where Parole Agent Leitzel had left them. N.T. 12/6/11 at 106. Thus, Parole Agent Leitzel contacted Appellant's landlord, told him that Appellant was being declared delinquent, and informed the landlord that he should contact the parole office if he sees Appellant. N.T. 12/6/11 at 106.

Parole Agent Leitzel testified that, after November 16, 2010, she continued to make random visits at the 203 State Street room house to check on other parolees, and she never again saw Appellant at the residence. N.T. 12/6/11 at 106. In fact, Parole Agent Leitzel testified that, after Appellant reported to her at the parole office in October of 2010, she did not again see Appellant until February of 2011, when he was an inmate at the Dauphin County Prison. N.T. 12/6/11 at 106–107.

**2.** The Commonwealth offered the testimony of Parole Agent Michelle Leitzel, Parole Agent Larry Eddie Smith, Jr., Pennsylvania State Trooper Mark Dean, Harrisburg Police Officer Christopher Silvio, and Harrisburg Police Detective Victor Rivera. Appellant offered the testimony of Troy Nenninger.

On cross-examination, Parole Agent Leitzel admitted she knew Appellant had a history of depression; however, she did not remember Appellant indicating he had run out of medicine near the time he absconded from supervision. N.T. 12/6/11 at 123. She denied knowing Appellant had a life partner living in Camp Hill. N.T. 12/6/11 at 122–123. She admitted that, "during [Appellant's] supervision, he was compliant at first, but within the last year he [was] hard to find at his residence and [was] defiant towards treatment." N.T. 12/6/11 at 124. Parole Agent Leitzel denied receiving a telephone call from the police in September of 2010 indicating Appellant had changed his residence or address. N.T. 12/6/11 at 126.

On redirect examination, Parole Agent Leitzel testified that, when she inspected Appellant's room on November 15, 2010, it did not appear to her that Appellant was living in the room. N.T. 12/6/11 at 127.

Larry Eddie Smith, Jr., who is a parole agent associated with the fugitive apprehension team with the U.S. Marshal's Fugitive Task Force, testified that Parole Agent Leitzel reported to him in late December of 2010 or early January of 2011 that Appellant was a parole absconder. N.T. 12/6/11 at 134. Parole Agent Smith indicated it is his job to locate fugitives, extract them, and place them into custody. N.T. 12/6/11 at 140. In attempting to locate Appellant, Parole Agent Smith examined various records and discovered Appellant had received a traffic citation on September 6, 2010. N.T. 12/6/11 at 136. The citation listed a Camp Hill apartment address for Appellant, and the vehicle, which Appellant was operating, was registered to "Troy Nenninger" at that address. N.T. 12/6/11 at 140–141.

On February 1, 2011, at approximately 9:30 a.m., Parole Agent Smith, along with other members of the U.S. Marshal's Fugitive Task Force, proceeded to the Camp Hill apartment. N.T. 12/6/11 at 137. No one initially answered the door; however, the marshals heard noise, which indicated some type of movement inside the apartment. N.T. 12/6/11 at 137–139. The marshals showed Appellant's photograph to neighbors, and after they affirmatively identified Appellant, the marshals, who again heard noise inside the relevant apartment, began "boot kicking" the door. N.T. 12/6/11 at 137–139. After approximately two kicks to the door, Appellant said, "Wait a minute, wait a minute, don't break the door." N.T. 12/6/11 at 139. However, by that time, the door's lock was jammed and the marshals finished making a forcible entry into the apartment. N.T. 12/6/11 at 139. Parole Agent Smith took Appellant, who was the sole person inside of the apartment, into custody and transported him to SCI Camp Hill. N.T. 12/6/11 at 139.

Pennsylvania State Police Trooper Mark Dean, a member of the forensic services unit, testified his unit handles the registration of sex offenders, who are required to report their residence to the unit "[y]early or within 48 hour of any change." N.T. 12/6/11 at 145–146. Trooper Dean indicated that, on September 8, 2010, Appellant provided a mailing and physical address to the unit of "203 State Street, Harrisburg." N.T. 12/6/11 at 149–150. Appellant did not provide the unit with a secondary mailing address, such as a P.O. box. N.T. 12/6/11 at 149–150. The form, which Appellant signed, contained a specific acknowledgment by Appellant that, if he changed his address, he was required to inform the Pennsylvania State Police within 48 hours. N.T. 12/6/11 at 152.

Harrisburg Police Officer Christopher Silvio testified he issued the September 6, 2010, traffic citation to Appellant, who provided to him an address of "12–B Richland

Lane, Camp Hill, PA[.]" N.T. 12/7/11 at 167. Officer Silvio acknowledged Appellant's certified driver's history from the Pennsylvania Department of Transportation listed a driver's license address of "749 Saint Joseph Street, Lancaster, PA[;]"; however, as is his routine, when the officer asked Appellant for his "current address," Appellant provided the officer with the Camp Hill address. N.T. 12/7/11 at 167–171.

Harrisburg Police Detective Victor Rivera testified he is assigned the duty of documenting the "comings and goings" of sex offenders in the city of Harrisburg, and on February 1, 2011, Parole Agent Leitzel informed him Appellant had absconded from parole. N.T. 12/7/11 at 181–182. Approximately a week later, Detective Rivera discovered authorities had apprehended Appellant and, on February 23, 2011, at approximately 9:35 a.m., he interviewed Appellant, who stated that:

> [H]e was pretty much fed up with the whole process of having to [abide by] the requirements that he had with parole once a month. He told me he was off meds. He told me he didn't particularly like the place that he lived at. And, in essence, then he told me that he went and stayed with his life partner in Camp Hill.

N.T. 12/7/11 at 185.

Detective Rivera testified that, "[Appellant] pretty much established from his statement that he left State Street and went over to live with his life partner in Camp Hill." N.T. 12/7/11 at 204.

Troy Nenninger testified he lives in a 800 square foot apartment at 12–B Richland Lane, Camp Hill, PA, and he and Appellant were a couple. N.T. 12/7/11 at 211–212. He indicated he assisted Appellant financially and, in return, Appellant worked around the house and on Mr. Nenninger's car. N.T. 12/7/11 at 213. On direct examination, the following relevant exchange occurred between Mr. Nenninger and Appellant's counsel:

**Q:** Okay. I want to turn your attention now to generally around October, November, December through February of this particular year. So the late part of 2010 the early part of this year. Are you with me time frame wise?

**A:** Yes.

**Q:** As far as [Appellant] moving in with you, did he at any point in time switch his address, change his address and move his belongings in your house?

**A:** Absolutely not, no.

**Q:** Had you guys discussed the possibility of living together?

**A:** There's no way I could live with anybody in that location, bottom line. I'm not one to live with anyone. I haven't had a roommate since the '90s. There is no possibility of adding anything to my home. I can't buy anything more, I can't do anything else. I don't have the space for anything. Living together—wasn't looking to live with anybody. If I'm going to live with somebody they need to be able to put forth a home. I'm not going to carry anybody like that.

**Q:** At any point in time during the time frame I just specified did—did [Appellant] live with you for 30 consecutive days? Strike the word live. Did he sleep over at your place 30 consecutive days?

**A:** No.

**Q:** Since the inception of your friendship or relationship with [Appellant] has he ever slept or crashed at your place for 30 consecutive days?

**A:** No.

**Q:** Tell the jury some of the things that you, over the duration of your

friendship, relationship with [Appellant], that you purchased for him.

A: I purchased the television, I purchased the DVD player, and I purchased an air conditioner for his apartment when he moved into his State Street address.

Q: At any point in time were those items placed in your apartment?

A: No.

Q: Is [Appellant] on your lease?

A: No.

Q: Was—did you ever try to put him on your lease?

A: No.

Q: Are you required to if you're going to have a change in your residence?

A: I would be required to actually sign a whole new lease.

Q: Was [Appellant] receiving mail at your address?

A: Never.

Q: Turning your attention now to February the 1st of this year. A date I assume you remember.

A: Yes.

Q: You came home to your apartment and what did you see?

A: The door looked unusual to me. It was bent slightly. And when I opened the door, I have a DVD rack that's fairly large behind the door and there were some DVDs on the floor.

[Appellant] was to clean that morning after I had left for work and the cleaning products were still sitting in the living room and it was not done.

Q: You—you thereafter learned that [Appellant] had been taken into custody, correct?

A: Correct.

N.T. 12/7/11 at 213–215.

On cross-examination, Mr. Nenninger indicated that, as of February 1, 2011, he was unaware Appellant was a convicted sex offender, on parole, or required to register his address changes with the Pennsylvania State Police. N.T. 12/7/11 at 221. Mr. Nenninger testified that, although he purchased items for Appellant to use in his apartment, he made no such purchases from November 15, 2010, to February 1, 2011. N.T. 12/7/11 at 223–224. Mr. Nenninger admitted Appellant had a key to his Camp Hill apartment; however, he indicated he had such a key for cleaning purposes. N.T. 12/7/11 at 225. Mr. Nenninger admitted Appellant was permitted to be in his apartment even in Mr. Nenninger's absence. N.T. 12/7/11 at 226.

At the conclusion of all testimony, the jury convicted Appellant on one count of failure to comply with registration of sexual offenders requirements, 18 Pa.C.S.A. § 4915(a)(1), and he proceeded immediately to a sentencing hearing, at the conclusion of which the trial court sentenced Appellant to 42 months to 120 months in prison. This timely appeal followed, and all Pa.R.A.P.1925 requirements have been met.

Appellant's first contention is that the evidence was insufficient to sustain his conviction for failure to comply with registration of sexual offenders requirements under 18 Pa.C.S.A. § 4915(a)(1).

18 Pa.C.S.A. § 4915[3] provides, in relevant part, the following:

---

**3.** Amendments made to 18 Pa.C.S.A. § 4915 indicate that, on December 20, 2012, Section 4915 will expire and be replaced by 18 Pa. C.S.A. § 4915.1. However, the amendments clearly do not apply, and we shall apply the version of Section 4915, which became effective January 1, 2007.

**§ 4915. Failure to comply with registration of sexual offenders requirements**

(a) **Offense defined.**—An individual who is subject to registration under 42 Pa.C.S. § 9795.1(a) (relating to registration) or an individual who is subject to registration under 42 Pa.C.S. § 9795.1(b)(1), (2) or (3)[4] commits an offense if he knowingly fails to:

(1) register with the Pennsylvania State Police as required under 42 Pa.C.S § 9795.2 (relating to registration procedures and applicability)[.]

\*　　\*　　\*

18 Pa.C.S.A. § 4915(a)(1) (bold in original) (footnote added).

42 Pa.C.S.A. § 9795.2[5] provides, in relevant part, the following:

**§ 9795.2. Registration procedures and applicability**

(a) **Registration.**—

(1) Offenders *and* sexually violent predators shall be required to register with the Pennsylvania State Police upon release from incarceration, upon parole from a State or county correctional institution or upon the commencement of a sentence of intermediate punishment or probation. For purposes of registration, offenders and sexually violent predators shall provide the Pennsylvania State Police with all current or intended residences[.]

(2) Offenders and sexually violent predators shall inform the Pennsylvania State Police within 48 hours of:

(i) Any change of residence or establishment of an additional residence or residences.

\*　　\*　　\*

42 Pa.C.S.A. § 9795.2(a)(1), (2)(i) (bold in original).

42 Pa.C.S.A. § 9792,[6] which provides relevant definitions, indicates "residence" includes "[a] location where an individual resides or is domiciled or intends to be domiciled for 30 consecutive days or more during a calendar year."

 In the case *sub judice,* Appellant argues the Commonwealth failed to prove that he changed his address, i.e., resided, domiciled, or intended to be domiciled for 30 consecutive days or more in any place besides 203 State Street. Thus, Appellant argues the Commonwealth failed to prove Appellant was required to contact the Pennsylvania State Police regarding any address change, within 48 hours or otherwise.

In reviewing sufficiency of evidence claims, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such

---

4. In the case *sub judice,* there is no doubt Appellant was subject to the registration requirements under 42 Pa.C.S. § 9795.1.

5. Effective February 21, 2012, 42 Pa.C.S.A. § 9795.2 was amended to include language related to registration requirements for individuals who have a temporary dwelling, including a homeless shelter or park. There is no issue presented in this case related to this amendment.

6. Effective February 21, 2012, 42 Pa.C.S.A. § 9792 was amended to provide language indicating that "residence" may include temporary habitat or other temporary places of abode, such as a homeless shelter or park, where the individual is lodged, such that they are required to register under the statute. There is no issue presented in this case related to this amendment.

that every essential element of the crime is established beyond a reasonable doubt. Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise. Entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The fact finder is free to believe all, part, or none of the evidence presented at trial.

*Commonwealth v. Moreno,* 14 A.3d 133, 136 (Pa.Super.2011) (citations omitted).

 In the case *sub judice,* in analyzing Appellant's sufficiency of the evidence claim, the trial court set forth, in pertinent part, the following in its Pa.R.A.P. 1925(a) Opinion:

In the instant case, [A]ppellant was found guilty of intentionally or knowingly failing to inform the [Pennsylvania State Police (hereinafter PSP)] of a change in residence or establishment of an additional residence within forty eight (48) hours. The jury was to determine that [A]ppellant was an individual who was required by law to notify the PSP of a change in his residence within forty eight (48) hours of the change, that [A]ppellant failed to register the change in residence, and that the failure was done knowingly or intentionally.

The evidence presented during trial established that, in the past, [A]ppellant had registered his address with the PSP as 203 State Street, Harrisburg, PA. The State Street address was the address of record with [A]ppellant's Parole Agent Leitzel while she was supervising [A]ppellant's parole case since 2009.

She had been to see [A]ppellant at this location many times while meeting with him.

Then, on September 6, 2010, when [A]ppellant was stopped for a traffic violation[,] the State Street address was not provided, rather, based on the car's registration and insurance, 12–B Richland Lane, Camp Hill, PA was the address provided. Additionally, a check of [A]ppellant's driver's license through PennDOT showed a Lancaster address. The arresting officer, Christopher Silvio, testified that it was his practice to verbally verify that the information on the license is correct and, if it is not, he asks for the current address. [N.T. 12/7/11 at 167–169]. Appellant did not correct any address information pertaining to the traffic citation. [N.T. 12/7/11 at 168].

Testimony presented by State Trooper Mark Dean, who had been processing sex offender registrants for seven (7) years, established that two days after the issuance of the citation, on September 8, 2010, [A]ppellant had registered his address as 203 State Street, Harrisburg, PA 17101. [N.T. 12/6/11 at 149]. Trooper Dean testified that [A]ppellant was made aware at the time of his initial registration of the necessity of updating the PSP of any changes in residence within forty eight (48) hours, and further, that same information is stated on the forms completed by a registrant each year. [N.T. 12/6/11 at 151–152].

Additionally, [Parole] Agent Leitzel's testimony established that [A]ppellant did not appear for his required monthly meeting with her on November 10, 2010. [Thus,] [o]n November 15, 2010, [Parole] Agent Leitzel went to the State Street address, went into [A]ppellant's [locked] room [using a key provided by the landlord] but did not find him, and found

that a large portion of his belongings were gone. [In fact, Parole Agent Leitzel testified she observed no articles of daily living in Appellant's State Street room on November 15, 2010, and it did not appear to her that Appellant was living in the room]. [Parole] Agent Leitzel left a [bright yellow] notice [on the door of Appellant's] State Street room stating he must appear at her office on November 16, 2010 or face a parole violation or delinquency. [Parole] Agent Leitzel testified that [Appellant failed to appear at her office and, when she went back to Appellant's State Street room on November 16, 2010, the bright yellow notice remained on the door where Parole Agent Leitzel had left it]. [At this point, Parole Agent Leitzel] declared him to have absconded from parole and, [despite the fact she continued to visit the State Street address], she did not see [Appellant] again until he was apprehended in February 2011. [N.T. 12/6/11 at 107]. In January 201[1], Parole Agent Smith received [Parole] Agent Leitzel's case information and commenced an investigation in conjunction with the U.S. Marshal's Fugitive Task Force to effectuate apprehension of [A]ppellant. [N.T. 12/6/11 at 129, 134–135]. [Parole] Agent Smith apprehended [A]ppellant on February 1, 2011 at the address listed on the September 6, 2010 citation, which is 12–B Richland Avenue, Camp Hill, PA. [N.T. 12/6/11 at 137–140].

After apprehension, on February 23, 2011, during a recorded interview with Detective Rivera, [A]ppellant said that he had left the State Street location and went to live with his life partner in Camp Hill. [N.T. 12/7/11 at 204]. [Appellant told Detective Rivera that he was pretty much "fed up" with the whole process of having to abide by the requirements that he had with parole, and

he did not like living at the State Street address. N.T. 12/7/11 at 185].

Troy Nenninger had been residing in the apartment at 12–B Richland Lane, … Camp Hill for seven years. [N.T. 12/7/11 at 212, 218–219]. Mr. Nenninger had begun a relationship with [A]ppellant in August 2009 that started as friendship, progressed to a sexual relationship, and then evolved into companionship and friendship. [N.T. 12/7/11 at 212–213]. Appellant drove Mr. Nenninger's car, helped with household chores, performed mechanical repairs on his cars, helped with outdoor chores, helped with heavy lifting, and had a key providing free access to Mr. Nenninger's residence. [N.T. 12/7/11 at 217, 222–223, 225, 228]. Additionally, [A]ppellant helped Mr. Nenninger personally because of physical limitations due to health problems. [N.T. 12/7/11 at 213, 227–228].

Trial Court Opinion dated 4/2/12 at 12–14.

■ We agree with the trial court's reasoning in this regard and, more specifically, agree that the evidence sufficiently supports the inference that, at the very least, Appellant had an "additional residence" at 12–B Richland Lane, Camp Hill, PA such that he was required to report the residence to the Pennsylvania State Police within 48 hours. *See* 18 Pa.C.S.A. § 4915(a)(10, 42 Pa.C.S.A. §§ 9792, 9795.2). We specifically find unavailing Appellant's sufficiency argument based on his self-serving version of the events, which the jury was free to disregard. *See Moreno, supra.*

■ Appellant's next argument is that the trial court erred in denying him a mistrial due to a prejudicial comment made during the prosecutor's closing argument. Specifically, Appellant points this Court to the following relevant exchange,

which occurred during the prosecutor's closing argument:

> [PROSECUTOR]: There's a saying that all it takes for evil to thrive is for good people to do nothing.
>
> [APPELLANT'S COUNSEL]: Objection. She's calling my client evil.
>
> THE COURT: I just gave you a continuing objection and now you're objecting again.[7]
>
> [APPELLANT'S COUNSEL]: This is something new now.
>
> THE COURT: Your objection is noted. Please sit down.
>
> [PROSECUTOR]: There is a statement that all it takes for evil to thrive is for good people to do nothing. The Commonwealth is requesting that you do your duty and that you do something in this case. Do not—
>
> [APPELLANT'S COUNSEL]: Objection, Your Honor. I mean, Judge-
>
> THE COURT: Sustained.
>
> [APPELLANT'S COUNSEL]:—do something.
>
> THE COURT: Sustained on that point. Okay. The jury will rely on the evidence and decide whether the Commonwealth has proven their case beyond a reason-

able doubt. That's your job. Now let's move on.

N.T. 12/7/11 at 268 (footnote added).

Initially, we note that a fair reading of the above excerpt is that, while the trial court sustained Appellant's objection and gave a cautionary instruction as to the prosecutor's statement that "[t]he Commonwealth is requesting that you do your duty and that you do something in this case[,]" the trial court did not sustain Appellant's objection or give a cautionary instruction as to the prosecutor's statement that "all it takes for evil to thrive is for good people to do nothing." Therefore, since the trial court did not sustain Appellant's objection to this specific statement, it was unnecessary for Appellant to request specifically a mistrial in order to preserve the issue.[8] *See Commonwealth v. Molina*, 33 A.3d 51, 56 n. 4 (Pa.Super.2011) (holding that, when an objection is overruled, failing to request curative instructions or a mistrial does not result in waiver).

 With regard to the denial of mistrials, the following standards govern our review:

> In criminal trials, the declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial.

---

7. For purposes of clarification, we note that, during the prosecutor's closing argument, Appellant's counsel made numerous objections, which the trial court overruled. N.T. 12/7/11 at 266–267. Just prior to the challenged excerpt set forth *supra* and *infra*, Appellant's counsel asked the trial court, "Judge, may I just have a continuing objection so I don't keep interrupting everybody?" N.T. 12/7/11 at 267. The trial court responded, "Certainly." N.T. 12/7/11 at 267.

8. Our conclusion the trial court did not sustain Appellant's objection as to the "evil statement" is further supported by the fact that,

after the trial court charged the jury and the jury left the room to begin deliberations, Appellant's counsel made a request for a "directed verdict" with regard to the prosecutor's "evil statement." N.T. 12/7/11 at 292–293. The trial court denied the motion solely on the basis there was no prosecutorial misconduct. N.T. 12/7/11 at 292–293. To the extent the procedural remedy of a directed verdict is appropriate for a prosecutor's prejudicial comment, as is discussed *infra*, we agree with the trial court that the prosecutor's statement did not constitute prosecutorial misconduct.

By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interests but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion.

\* \* \*

 The remedy of a mistrial is an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.'

With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that [i]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made. Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial.

\* \* \*

 It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard.

We are further mindful of the following:

In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.

*Commonwealth v. Judy*, 978 A.2d 1015, 1019–1020 (Pa.Super.2009) (quotations, quotation marks, and citations omitted). *See Commonwealth v. Ragland*, 991 A.2d 336 (Pa.Super.2010).

Appellant contends that the prosecutor referred to Appellant as "evil" when the prosecutor, on two occasions, stated, "There's a saying that all it takes for evil to thrive is for good people to do nothing." *See* Appellant's Brief at 16. Appellant contends the unavoidable effect of the statement was to prejudice the jury. *See* Appellant's Brief at 16–17. We disagree.

The prosecutor's statement, while arguably intemperate, was not inflammatory to such a degree that it would fix bias and hostility against Appellant in the minds of the jury. *See Judy, supra.* The statement was not a direct indictment of Appellant's moral character, and it was made in isolation at the close of the trial. For

these reasons, and in light of the overwhelming evidence of Appellant's guilt, we find a new trial is not warranted on this basis.

We note that we specifically find unavailing Appellant's argument that the unavoidable effect of the prosecutor's statements was to prejudice the jury since the prosecutor's statement was similar to statements used by local newspapers in reference to an unrelated criminal matter involving Jerry Sandusky.[9] *See* Appellant's Brief at 17–18; N.T. 12/7/11 at 305–307. Appellant seems to suggest that the jury "lumped him in" with the prominent Jerry Sandusky case since the prosecutor's statement was used at Appellant's trial and in public writings concerning Jerry Sandusky. In this regard we note that, after he was sentenced, Appellant indicated he wished to provide additional argument to support his objections concerning the prosecutor's "evil statement." Specifically, we note the following:

> [APPELLANT'S COUNSEL]: We waive reading of [Appellant's] post-sentencing rights, Your Honor.
>
> And I'd also like to supplement the previous oral motion ... based upon prosecutorial misconduct. I'm introducing what's been marked as Defendant's Exhibit D into the record.
>
> (Defendant Exhibit D was produced and marked for identification).
>
> [APPELLANT'S COUNSEL]: After I had talked—talked about the quote from the prosecutor during closing, I had discussed that with other folks in my office and they clued me in to the fact that there has been a very public display of that quote as it relates to the Jerry

Sandusky matter. I had no knowledge of that.

> [PROSECUTOR]: Neither did I, Your Honor.
>
> THE COURT: And neither did I.
>
> [APPELLANT'S COUNSEL]: Right. And that's fine.
>
> THE COURT: Well, it's the record.
>
> [APPELLANT'S COUNSEL]: That may have been an unintended consequence of [the] prosecutor's choice to make those comments. But nonetheless, particularly in this area, I think that becomes even more prejudicial and more pertinent. So I'm marking as Defendant's Exhibit D, which is something I printed from the internet, and we can, of course, supplement that when the time comes.
>
> [PROSECUTOR]: And just for the record, Your Honor, it a photograph from where?
>
> [APPELLANT'S COUNSEL]: We printed it off of the internet. But my understanding is that photograph is the one that's been splashed all over the local papers. The Patriot News. I didn't have time to do—
>
> [PROSECUTOR]: Your Honor, just for the record, I've never seen that photograph. I was unaware that it has been—that quote has been used in connection with the Sandusky case at all. It is something that I've used in closings in this courthouse with some of [Appellant's counsel's] colleagues previously, certainly well before anything happened with the Sandusky case.
>
> THE COURT: And the original quote is from who, Jefferson or something?

---

9. At the time of Appellant's trial, Jerry Sandusky, a retired assistant football coach at the Pennsylvania State University, was facing trial on numerous counts of sexual abuse of young boys over a fifteen-year period. During the pendency of Appellant's direct appeal, on June 22, 2012, a jury convicted Jerry Sandusky on forty-five counts related to the sex abuse.

[PROSECUTOR]: I actually forget now, Your Honor, I believe it's actually an English scholar.

[APPELLANT'S COUNSEL]: Are we excused, Your Honor?

THE COURT: ... Yes, absolutely. Thank you very much. Thank you.

N.T. 12/7/11 at 305–307.

As is evident, the prosecutor, Appellant's counsel, and the trial court indicated that they were unaware of any relationship to or public display of the prosecutor's "evil statement" in connection with the Jerry Sandusky matter. Thus, without further evidence on this matter, it is purely speculative that the jury was aware of any connection in this regard, and we decline to find the unavoidable effect of the comments at issue was to prejudice the jurors on this basis. *See Judy, supra.*

■ Appellant's final contention is that the trial court erred in overruling Appellant's objection to the trial court's questioning of Parole Agent Larry Eddie Smith, Jr., as to the differences between parole and probation. Appellant contends the line of questioning was irrelevant and/or unduly prejudiced Appellant by emphasizing the fact he had previously committed a crime punishable by incarceration.

■ Our standard of review for evidentiary issues is well settled. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Glass,* 50 A.3d 720, 724–725 (Pa.Super.2012) (quotation and quotation marks omitted).

■ With regard to a trial judge questioning witnesses, we note the following:

A trial judge must be ever cautious that his questioning of witnesses not show bias or a belief in the credibility of particular witnesses. However, a trial judge has the inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information. Where these are the objectives of the questioning and it is not unduly protracted or conducted in a biased manner, the trial judge's discretion in questioning witnesses will not be found erroneous.

*Commonwealth v. Folino,* 293 Pa.Super. 347, 439 A.2d 145, 148 (1981) (quotation and citations omitted).

In the case *sub judice,* Appellant asks us to examine the following relevant excerpt from Parole Agent Smith's direct examination:

Q: Where are you employed?

A: The Pennsylvania Board of Probation and Parole.

Q: How long have you been employed by the Pennsylvania Board of Probation and Parole?

A: Going on 16 years.

Q: And, say, in the past year or so what are your duties with the Board?

A: I'm—since 2006 I've been on a fugitive apprehension team with the U.S. Marshal's Fugitive Task Force.

Q: What does that mean in plain English?

A: We track down fugitives and apprehend them and return them back to jail or take them to court if they're required to go for, you know, preliminary arraignment or anything like that, and just fugitive apprehension.

Q: So the jury has heard a little bit about people who are on probation or parole. They, generally speaking, report to somebody like Ms. Leitzel, correct?

A: Correct.

Q: We've heard the term absconder. What does that mean?

A: They're no longer in the good graces of parole, for lack of a better term. They've either stopped reporting, moved from the approved residence, traveled outside of the district or the state without permission, which is generally the reasons we would have somebody declared delinquent or an absconder.

THE COURT: Mr. Smith, let me ask you just for the jury's clarification, okay. Can you explain to the jury the difference between someone being on probation and someone being on parole?

THE WITNESS: Yes, sir. [A] [p]robationary sentence does not carry jail time with it. I may be sentenced to a probation sentence, a year of probation, I don't necessary have to go, you know, to prison on that, I report to a probation officer. In those cases the judge retains control of the case as far as revocation.

I could be—if I violate that probation or parole I would go back in front of the judge, I would be revoked. I could technically be resentenced to the maximum sentence or penalty for that offense.

A parole sentence is different in that I've been sentenced to jail time. I may have a county sentence, a federal sentence, a state sentence. There's a minimum and maximum on that sentence.

So if I had a one to two year sentence I must serve a year of incarceration with the possibility or privilege of parole after that first year. If I am granted the privilege of parole after that year I report to, say, Ms. Leitzel on the state sentence in our state parole office.

If I violate that and I'm taken back in custody I then go in front of the parole board who makes a determination of my sentence. The difference being that on a parole sentence they can't resentence me then to the maximum for that offense but—

[APPELLANT'S COUNSEL]: Your Honor, I'm going to object to this testimony. I mean, it's way beyond the scope of the Court's question and I don't know that it's particularly relevant either—

WITNESS: I apologize.

[APPELLANT'S COUNSEL]:—in the sentencing.

THE COURT: Thank you, [Appellant's counsel]. I appreciate it, but go ahead, continue.

THE WITNESS: As I was saying, I would just then be—like I could be given whatever time I owe to the parole board. I could serve my one year in prison. I was out on parole for a period of, say, six months, I then owe the parole board another six months unless I'm convicted of a new crime while I'm on parole supervision, then I would lose that six months.

[APPELLANT'S COUNSEL]: Your Honor, I object.

THE COURT: We're getting—

[APPELLANT'S COUNSEL]: May we approach? May we approach, please?

THE COURT: Not at this point. Thank you. So in summary, okay, probation, person doesn't go to jail unless there's some problem?

THE WITNESS: Correct.

THE COURT: Parole, there might be some time in jail and then they're released but still on supervision for a period of time?

THE WITNESS: Yes, Your Honor.

**THE COURT:** That's all I think we need.

N.T. 12/6/11 at 129–132.

In its Pa.R.A.P. 1925(a) opinion, the trial court provided the following explanation regarding Appellant's claim:

> The trial court judge requested that [Parole Agent] Smith explain to the jury the difference between someone being on probation and someone being on parole. [N.T. 12/6/11 at 130–132]. [Parole Agent] Smith had already testified to his employment with the Pennsylvania Board of Probation and Parole and his duties on a fugitive apprehension team in conjunction with the U.S. Marshal's Fugitive Task Force. [N.T. 12/6/11 at 129–130]. The question was posed by the [trial] court after [Parole Agent] Smith testified regarding the meaning of 'absconder' in relation to an individual being on parole. [N.T. 12/6/11 at 130]. Further, the testimony of [A]ppellant's parole supervisor, Michelle Leitzel, had already established that [A]ppellant was on parole. [N.T. 12/6/11 at 92–93]. In a brief manner, the trial judge merely attempted to clarify for the jury technical terms which are particular to criminal law and often confused. Direct examination and cross-examination proceeded accordingly. [N.T. 12/6/11 at 129–144]. Additionally, defense counsel mentioned that [A]ppellant was on parole in his opening statement. [N.T. 12/6/11 at 74].

Trial Court Opinion filed 4/2/12 at 9–10.

We find no abuse of discretion in this regard and highlight that the trial judge's questioning of Parole Agent Smith was intended to clarify information for the jury, was not unduly protracted, and was conducted in a non-biased manner. *Folino, supra.* Additionally, as the trial court noted in its opinion, the fact Appellant was on parole was clearly made well-known to the jury prior to the trial judge's questioning of Parole Agent Smith, and therefore, contrary to Appellant's assertion, the trial judge's questioning did not improperly emphasize information not otherwise previously presented to the jury. Finally, information concerning Appellant's parole status was relevant inasmuch as the crime with which Appellant was charged under 18 Pa.C.S.A. § 4915 requires registration of a sexual offender's address upon release from incarceration, upon parole from a State or county correctional institution or upon the commencement of a sentence of intermediate punishment or probation. *See* 18 Pa.C.S.A. § 4915(a)(1), 42 Pa.C.S.A. § 9795.2.

For all of the foregoing reasons, we affirm.

Affirmed.