J-S17034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Z.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PA STATE POLICE | : | No. 2146 EDA 2023 |

Appeal from the Order Entered July 17, 2023
In the Court of Common Pleas of Philadelphia County
Civil Division at 230400135

BEFORE:  BOWES, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:               **FILED JUNE 18, 2024**

Z.L. (Appellant) appeals from the order denying his petition to restore his right to possess firearms.  After careful review, we affirm.

Facts and Procedural History

Appellant is 34 years old.  When Appellant was 16 years old, he was involuntarily committed to Armstrong County Hospital pursuant to Section 302 of the Mental Health Procedures Act (MHPA), 50 Pa.C.S. § 7302. Consequently, he is prohibited from possessing firearms.  *See* 18 Pa.C.S. § 6105(c)(4) (prohibiting possession of firearms by anyone "who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302 … of the … [MHPA]").

On April 3, 2023, Appellant filed a petition to restore his firearm rights pursuant to 18 Pa.C.S. § 6105(f)(1).  Section 6105(f)(1) states:

Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person.

18 Pa.C.S. § 6105(f)(1).

Appellant averred he "has not required any additional psychological services or treatment for any mental health condition" since 2006. Petition to Restore Firearm Rights as a Result of an Involuntary Commitment, 4/3/23, at 2. Appellant stated that he "no longer suffers from any putative mental health condition that was the basis of the commitment," and "has established an uninterrupted period of psychological stability of over 17 years in his adult life." *Id.* at 4. In support, Appellant attached "a psychological evaluation from Dr. Noa Glick, Psy.D." *Id.* at 2. Dr. Glick concluded Appellant "currently does not pose a danger to himself or others should his access to firearms be restored." *Id.* at 3 (incorporating Dr. Glick's report as Exhibit A).

Appellee, the Pennsylvania State Police (PSP), filed an answer in opposition to Appellant's petition on April 21, 2023. The trial court held a hearing on July 12, 2023. Appellant, Dr. Glick, and Appellant's father, B.L., testified in support of the petition.

Appellant testified that his involuntary commitment was the result of his parents' concern about his cannabis use. N.T., 7/12/23, at 5-8. He stated, "when the 302 took place[,] I would use cannabis regularly and my parents would often argue with me about it." *Id.* at 7.

Appellant explained that shortly before his involuntary commitment, he was "voluntarily committed" for inpatient treatment at Western Psychiatric Hospital (Western Psych). *Id.* at 12-13. Appellant testified:

[P]rior to the [302] commitment … I was voluntarily committed by my parents [after] an argument … about cannabis use and [] at that time … they said we're going to bring you to a hospital basically. So I went with them to the hospital where I was voluntarily committed for 9 days, I believe, 9 or 10 days.

*Id.* at 12.

The involuntary commitment occurred approximately one week later. *Id.* at 15, 20. Appellant testified:

I was very angry about being at [Western Psych]. And I returned home and I was home for about a week, then I made some plans to go out with some friends one evening. … [A]s I was about to go to my friend's car, my father walked outside, embarrassed me in front of my friends and told me that I wasn't going out and everything. And I became very upset about this.

And then I went in the house, and I threw a couple of things on the floor, and I broke some objects, not directed at a human but just like … picking up a picture frame and throwing it on the floor, something like that. And my parents ended up calling the police on me.

***

[T]he police did not 302 me. The police basically said to me, you have the option[;] we can take you to the hospital or you can go to jail. And at that time[,] I thought the safer option was the hospital. So I chose the hospital. So they took me to Armstrong County Hospital and I was there voluntarily committed [*sic*], and I'm not really certain how the 302 took place.

*Id.* at 15-16.

Appellant recalled being at Armstrong County Hospital for five days and receiving medication for depression. *Id.* at 17, 20. He had no "follow up

treatment" because he "didn't think that it was going to benefit me, and my parents did not try to put me into further treatment." *Id.* at 21.

Appellant indicated that as an adult, he has rarely or only occasionally used marijuana. *Id.* at 23. However, he stated that he obtained a medical marijuana card "during COVID … to help me with the stress and anxiety around the COVID quarantine." *Id.* at 22. According to Appellant, he has not used cannabis since his medical marijuana card expired in June 2022. *Id.* at 24.

Appellant testified that he wanted a firearm because he has "some interest in World War II era firearms[,] but the main reason I want this relief … is I really do not like the stigma." *Id.* at 29. Appellant added that he "would like … the freedoms of every other American citizen." *Id.* at 30. He stated that he is "not mentally ill[, and does not] live a criminal lifestyle[,] so I don't understand why I do not have the same rights as everyone else in my country." *Id.*

Dr. Glick testified as an expert in forensic psychology. *Id.* at 44. Dr. Glick evaluated Appellant on July 21, 2022. *Id.* at 45. As part of her evaluation, Dr. Glick reviewed the following documents:

> Armstrong County Memorial Hospital psychiatric discharge summary by John Soffietti[,] M.D.[,] dated May 16, 2006. Armstrong County Memorial Hospital psychiatric history and physical by John Soffietti, M.D.[,] dated May 12, 2006. Armstrong County Memorial Hospital psychiatric history and physical by D. Wesley Minteer, Jr., DO, dated May 12, 2006. Armstrong County Memorial Hospital lab summary, location report from [May 16, 2006]. Armstrong County Memorial Hospital physician's progress note, handwritten, May 12, 2006 – May 15, 2006. Armstrong

County Memorial Hospital patient information. Armstrong County Memorial Hospital psychiatric/admission orders, May 12, 2006, and Butler County Human Services Department, [patient transfer record dated May 11, 2006, by Dr. Minshull, certifying Appellant's transfer from Butler County Hospital to Armstrong County Hospital as "medically necessary and appropriate" for "specialty psych care"].

*Id.* at 46-47 (trial court's admitting the documents collectively as Exhibit C).

Dr. Glick completed a "full evaluation … to ascertain [Appellant's] history in terms of [his] personal life, educational, legal history, [and] mental health history." *Id.* at 46. She also contacted Appellant's father "at his request." *Id.* at 48.

Dr. Glick concluded Appellant "did not have any specific risk factors that would preclude him from owning a firearm." *Id.* at 49. She explained that testing revealed Appellant's "validity indicators" to be "within the normal limits[,] with the exception of one which was noted to be [on] the defensiveness scale." *Id.* at 49-50. Dr. Glick stated that the "score can also be indicative of high educational background, and also socio[-]economic status[,] which is why I didn't invalidate the test." *Id.* at 50. Dr. Glick opined: "I believe that currently [Appellant] is able to safely possess a firearm." *Id.* at 50-51.

Appellant's father, B.L., also testified in support of Appellant's petition. B.L. recounted difficulties parenting Appellant in 2006. *Id.* at 62. He described "constant friction" and "disagreement regarding [Appellant's] cannabis use." *Id.* B.L., who is a physician, stated that he

didn't know if [marijuana] was a particularly bad health thing, but I told [Appellant it] would lead to other drugs[, which] I was

- 5 -

taught when I was growing up in the 50s, 60s, and medical school [in the] early 70s, [that] it led to the use of harder drugs that could be detrimental to a person's health mentally and physically, and I didn't want him to do it.

*Id.* at 63-64.

B.L. corroborated Appellant's testimony about the two commitments. The first commitment occurred when B.L. took Appellant to Western Psych and "asked them to treat" Appellant. *Id.* at 80. B.L. stated that Appellant "went voluntarily" to Western Psych for "more or less a week." *Id.* at 80-81. B.L. relayed that shortly after Appellant returned home, his friends came to the house. *Id.* at 61. According to B.L., he "humiliated" Appellant

by telling these friends to get out of here, tell[ing] them to go away, and my son wouldn't be going with them that night to some party, wherever they were going, I did not want my son to go, and that led to -- when I went back into the house, and [Appellant] went back into the house, that led to an altercation….

*Id.*

B.L. recalled Appellant being "very upset and angry." *Id.* at 65. B.L. testified:

He was very angry at that moment, and I was very concerned because my son had never been that angry, and he was not a violent person. And he threw -- I said about two objects … on the ground and they broke.

*Id.* at 68. B.L. also stated:

I remember [Appellant] throwing something on the floor, one or two things on the floor. I cannot recall, I don't think it could have been me who called the police but I may have called my wife to call the police, but the police were called, came very quickly, it all happened very quickly.

\*\*\*

> [T]here were two policemen, one … told me that he didn't feel he could arrest [Appellant, and] I said I don't want you to arrest my son…. [The policeman] recommend[ed that the police] take [Appellant] voluntarily … to someplace, a hospital. He didn't know which hospital at th[at] point[,] to cool off or whatever, and that's what he did. I told him … that was a good idea[]. I thought that was a good idea.

*Id.* at 65-66. The police took Appellant to the hospital while B.L. and his wife remained at home. *Id.* at 73. B.L. does not know what transpired when Appellant arrived at the hospital. *Id.* at 73-74.

B.L. confirmed that Appellant did not receive counseling after either commitment. *Id.* at 75. B.L. stated he did not know about Appellant's being prescribed antidepressant medication in 2006; he was also unaware of whether Appellant experienced anxiety or depression as a teenager. *Id.* at 75, 78. B.L. opined that Appellant could safely possess firearms without risk to himself or others. *Id.* at 79.

At the close of the hearing, the trial court stated it would take the matter under advisement. *Id.* at 87. On July 17, 2023, the trial court entered the order denying the petition. The trial court determined Appellant "had not met his burden of proving that restoration of his firearm rights would not pose a risk of harm to himself or others." Trial Court Opinion (TCO), 1/17/24, at 16.

Appellant timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(b).

## Issues

The questions Appellant presents in his brief do not align with his argument. *See* Pa.R.A.P. 2116 (requiring that an appellate brief include a

Statement of Questions Involved); *see also* Pa.R.A.P. 2119(a) (requiring the argument "be divided into as many parts as there are questions to be argued"). Appellant presents four questions, but divides his argument into two parts.[1] *See* Appellant's Brief at 2-3, 7, and 10. We address the two issues in Appellant's argument: (1) whether the trial court demonstrated partiality, bias, prejudice, and ill-will toward Appellant in its questioning of Appellant and his witnesses; and (2) whether the trial court's decision was manifestly unreasonable because it was based on the trial court's misunderstanding of the law and facts. *Id.* at 7, 10.

Analysis

At the outset, we recognize that "petitioners proceeding under § 6105(f)(1) are required to establish that they 'may possess a firearm without risk to [themselves] or any other person.'" *In re C.R.J.*, No. 1387 WDA 2021, unpublished memorandum at *4 (Pa. Super. filed Aug. 22, 2022).[2] The "language in section 6105(f)(1) plainly leaves the decision of whether to restore the right to possess a firearm within the discretion of the trial court." *E.G.G. v. Pennsylvania State Police*, 219 A.3d 679, 683 (Pa. Super. 2019). An abuse of discretion occurs when the law is overridden or misapplied, or the

---

[1] Appellant raised three issues in his Pa.R.A.P. 1925(b) concise statement, including the two issues he argues in his brief. Concise Statement of Matters Complained of on Appeal, 9/13/23, at 1-2 (unnumbered).

[2] This Court's non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value. Pa.R.A.P. 126(b).

judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record. *Id.* The trial court, as factfinder, is free to believe all, part or none of a witness's testimony. *Id.*

### 1. Partiality, Bias, and Prejudice

Appellant claims the trial court demonstrated "clear partiality, bias, and prejudice" against him, which warrants reversal of the order denying relief. Appellant's Brief at 10. Appellant states that the trial court "began to interject questions, beginning at first innocuously, asking the witness to speak louder and asking a question at the same time." *Id.* at 7. According to Appellant, the trial court "commandeered the direct examination" and "demonstrated a clear and hostile prosecutorial bent." *Id.* at 7-8. Appellant states, "this is not the first occasion where the questioning of this [trial court] took a prosecutorial bent and demonstrated an improper animus against one party." *Id.* at 8. Appellant cites *Commonwealth v. Lucky*, 229 A.3d 657, 665-68 (Pa. Super. 2020), but does not discuss the case or expand further.

In response, the PSP states:

> [Appellant] argues that the trial court's decision was the result of bias or prejudice against [him] based primarily on the number of questions asked by the trial court during the hearing. Although this [questioning] could also be considered an indication of the trial court's concern for creating as complete a record as possible to the benefit of [Appellant], his failure to object at the time to the trial court's conduct of the examination results in waiver of the issue. *See* Pa.R.A.P. 302.

PSP's Brief at 9 (citation omitted).

We agree that the issue is waived because Appellant did not raise it with the trial court. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a); *Commonwealth v. Wright*, --- A.3d ----, 2024 PA Super 72 (filed Apr. 15, 2024) (citing Pa.R.A.P. 302(a) and finding waiver where the appellant did not object to the trial court's questioning of a witness).

Pennsylvania Rule of Evidence 614(b) permits the trial court to "examine a witness regardless of who calls the witness." Pa.R.E. 614(b). Moreover, a party "may object to the court's … examining a witness … when the witness is examined." Pa.R.E. 614(c).

Appellant does not dispute his failure to object to the trial court's questioning. Instead, he attempts to distinguish the oversight by stating he "is not arguing that the [c]ourt's questioning of the witnesses prejudiced [Appellant] before a jury, but that the nature of the trial court's questioning is indicative of the type of partiality and bias that was further reflected in the numerous errors and attacks within the July 17, 2023 Order, and January 17, 2024 Opinion." Appellant's Reply Brief at 3. We are not persuaded by Appellant's response and conclude the issue is waived. *Wright*, *supra*.

In any event, the issue would lack merit even if preserved. As the PSP states:

> [Appellant] points to no factors that could cause the trial court to have prejudice, bias or ill-will against him. Instead, he cites to an irrelevant and unrelated criminal case involving the same trial court imposing a sentence on a defendant already under its probationary supervision. … *Lucky*, 229 A.3d [at] 657….

PSP's Brief at 10.

Pertinently, this Court has instructed:

> **[A] trial judge has the inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information**. Where these are the objectives of the questioning and it is not unduly protracted or conducted in a biased manner, the trial judge's discretion in questioning witnesses will not be found erroneous.

*Commonwealth v. Hogentogler*, 53 A.3d 866, 880 (Pa. Super. 2012) (emphasis added, citation omitted).

Here, the trial court found Appellant "demonstrated [a] lack of candor as to salient information regarding his mental health status and history of illegal narcotics usage." TCO at 2; *id.* at 2-6 (detailing contradictions in Appellant's testimony and quoting excerpts of the trial court's questions and Appellant's answers). Although the trial court did not quote the following excerpt, it reflects the trial court's attempt to elicit substantive information from Appellant:

> THE COURT: … [D]o you understand what a 302 mental health commitment is?
>
> THE WITNESS: I do understand what it is. Like I said, when I was brought to the hospital where the 302 took place I was brought there voluntarily. So my parents spoke to the police, they said we'll take him voluntary -- like, my parents said I would go to the hospital voluntarily. …
>
> THE COURT: [T]he police transported you to the hospital?
>
> THE WITNESS: Correct, but the police did not 302 me. The 302 took place at the hospital.
>
> THE COURT: Yes, after you were interviewed, yes?

THE WITNESS: Well, so, this is evidence that's like hearsay as you said. And the only thing that I know is what the original lawyer that I spoke to told me based on the information that he collected from the hospital.

THE COURT: You were [at the hospital]. So I'm asking you because what you are relating to me does not make sense.

THE WITNESS: I know that. It doesn't make sense to me either.

THE COURT: Well, okay, what you are relating to me is a minor disagreement [occurred between you and your father], and you have no idea why the[ hospital] would [com]mit you for that [five-day] length of time … consistent with … [S]ection [302] of the [MHPA].

THE WITNESS: I would agree with you. I think what they did was illegal. That is my stance on it.

THE COURT: All right.

N.T., 7/12/23, at 31-33.

The trial court also sought clarification from Dr. Glick. For example:

THE COURT: Did it strike you as odd that [Appellant's] recollection of those events [preceding his 302 commitment] reflected a portrayal of behavior that wouldn't normally lend itself to [a] commitment?

THE WITNESS: Yes.

THE COURT: So is it common that folks would understate what actually happened because they don't want to let you know what actually happened?

THE WITNESS: Sure.

THE COURT: Do you think that happened here?

THE WITNESS: I do think that there was some degree of that, but based on the number of evaluations I've done in the past, I don't think that the way in which he portrayed himself was dishonest, but it was just slightly defensive.

*Id.* at 51-52.

- 12 -

In its opinion, the trial court observed that "[s]everal aspects of Appellant's testimony did not align with his medical history and particular comments recorded by Dr. Glick…." TCO at 8. The court also noted that Appellant's father, B.L., "offered contradictory and highly emotionally charged testimony." *Id.* at 10. The record supports these findings and indicates that the trial court questioned the witnesses in an attempt to clarify facts and information germane to the disposition of Appellant's petition. Therefore, in the absence of waiver, we would find no abuse of discretion by the trial court.

*2. Manifest Unreasonableness and Relevant Law and Facts*

Appellant argues the trial court's denial of his petition was manifestly unreasonable. Appellant states that the trial court "gives no reason to believe that now, or at any time since 2006, [Appellant] would pose a risk of harm to himself or others." Appellant's Brief at 11. Appellant specifically assails the trial court's statement that it denied his petition "for lack of merit and because [Appellant] failed to credibly demonstrate justification for the requested form of relief." *Id.* at 10 (citing language in the July 17, 2023 order). Appellant claims he "is not required to assert any specific reason or justification for seeking the restoration of his right to possess a firearm, or any justification at all, provided that he is not seeking relief for the reason of using a firearm to do harm to himself or others." *Id.* This argument is flawed.

Appellant disregards and deflects his responsibility for establishing that he is not a danger to himself or others. *In re C.R.J.*, *supra*. While the trial court's use of the word "justification" is somewhat inartful, the trial court

appears to reference Appellant's responsibility when it concluded he "failed to credibly demonstrate justification for the requested form of relief." Order, 7/17/23.

The PSP states that the trial court properly "engaged in a deliberate 'balancing of interests [that is] well within the court's discretion.'" PSP's Brief at 12 (citing *In re A.Z.*, No. 1206 EDA 2021, unpublished memorandum at *3 (Pa. Super. filed Feb. 10, 2022)). In addition, the PSP observes that "the trial court, in making its determination, had not only the results of [Appellant's] psychological examination [and records], but also the benefit of observing and questioning [Appellant] and his father in the courtroom." *Id.* at 10-11.

The trial court found that Appellant was not credible. TCO at 2. For instance, the trial court explained that Appellant "denied that he had sold narcotics and claimed that the notation of this activity within the introduced prior medical reports had been falsely recorded." *Id.* The trial court described Appellant's "repeatedly minimiz[ing] the severity of his outbursts [with his parents,] and he unusually exhibited physical mannerisms demonstrating present difficulty with anger control at age thirty-four years." *Id.* at 4. The trial court noted Appellant's "testimony conflicted with the very limited medical records" he "introduced to support his Petition." *Id.* at 5 (describing the content of medical records introduced as Exhibit C). The trial court specified that "Armstrong County physicians had diagnosed Appellant with 'Juvenile Antisocial Behavior,' 'Cannabis Use Dependence' and 'Major Depressive

Disorder.'" ***Id.***; ***see also*** Exhibit C (Armstrong County Memorial Hospital, Discharge Diagnoses, 5/16/06, at 1). The trial court also noted "Appellant did not comply with any treatment recommendations and prescriptions" following discharge. TCO at 13.

The trial court opined:

> **As admitted in his [petition] filings and reflected in his medical history**, prior to his [involuntary] commitment, Appellant was treated [at Western Psych] for cannabis abuse and depression. [Shortly thereafter], Appellant became so angry with his parents that he began breaking things in their house and threatened self-harm. The situation escalated so greatly that his parents sought emergency help from law enforcement and [the] involuntary commitment resulted.
>
> ***
>
> Appellant flatly denied having any history of temper control or depressive behavior. Appellant's account therefore was incongruent. He claimed that [] minor misunderstandings or clerical errors had caused [his second] commitment to be "involuntary." Appellant's father, [B.L.], who is an experienced medical professional and [] surgeon, mimicked and enabled Appellant's distorted perception by claiming that his son had not threatened suicide. He minimized his son's outbursts and unnaturally absorbed responsibility for the consequences of his son's conduct.
>
> ***
>
> Frankly, it defies logic that the police would have been called on an emergency basis by the parents for the minor problem that had been described by both father and son. It [i]s equally unlikely that Appellant would have been committed for emergency psychiatric treatment … over a slight teenage temper tantrum. To date, this [c]ourt has not been provided a clear picture as to what caused Appellant's mental health commitments.

***Id.*** at 13-14 (emphasis added).

- 15 -

The trial court found Appellant "failed to offer credible and convincing evidence to alleviate this [c]ourt's concerns that he would pose a risk of harm or threat to himself or others if allowed to possess a firearm." ***Id.*** at 12. We discern no error. This Court has addressed policy considerations when an individual seeks to restore firearm rights following an involuntary commitment. ***See In re Keyes***, 83 A.3d 1016 (Pa. Super. 2013). We stated:

> [T]he government has an important interest in keeping firearms out of the hands of those who have ever been adjudicated mentally defective or who have ever been committed to a mental institution…. The dangers inherent in the possession of firearms by the mentally ill are manifest.
>
> ***
>
> Given the extreme potential harm attendant to the possession of deadly weapons by the mentally ill, and the risk of relapse, we see an important government interest in controlling the availability of firearms for those who have ever been adjudicated mentally defective or have ever been committed to a mental institution but are now deemed to be cured.

***Id.*** at 1026-27.

Our review reveals no abuse of discretion by the trial court. Accordingly, we affirm the denial of Appellant's petition to restore his right to possess firearms.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date:  6/18/2024