J-S02013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN OSCAR ESQUILIN | : | |
| | : | |
| Appellant | : | No. 719 EDA 2023 |

Appeal from the Judgment of Sentence Entered January 13, 2023
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0003842-2021

BEFORE: LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                    **FILED MAY 15, 2024**

John Oscar Esquilin appeals from the judgment of sentence, entered in the Court of Common Pleas of Lehigh County, following his conviction by a jury of persons not to possess firearms (F-2).[1]  We affirm.

On August 26, 2020, at approximately 10:30 a.m., Allentown Police Officer Robert Busch received a police radio call of a fight taking place at 5th and Washington Streets in the City of Allentown.  *See* N.T. Jury Trial, 11/14/22, at 55-56.  The radio call indicated that the fight was between a "person armed with a machete and a person armed with a firearm," one of whom was wearing a white tank top  and was seen leaving the scene in a

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6105(a)(1).

white Honda Accord. *Id.* at 56; *id.*, 11/15/22, at 22-23.[2] Officer Busch proceeded to drive to the scene "just shortly after the call came out," and, as he passed Tilghman Street,[3] he saw a white Honda Accord with a Florida license plate and stickers turn and travel past him in the opposite direction on 4th Street. *Id.*, 11/14/22, at 56-57, 84. Officer Busch, who lost sight of the vehicle that was travelling at a high rate of speed, relayed the location of the Accord to other officers who followed the vehicle and stopped it in an alley on Page Street less than one minute later. *Id.* at 57-58. *See id.*, 11/15/22, at 8-14 (Officer Vidal testifying he conducted vehicle stop after chasing Esquilin's car and trying to cut him off multiple times "so he would stop.").

After Officer Vidal stopped the Accord on the 400 block of Page Street , he drew his gun and asked Esquilin to show his hands as he exited the car. *Id.* at 15. Esquilin exited the vehicle from the driver's side where he "proceeded to undress himself to show that he didn't have any weapons." *Id.*, at 14-15. Officer Busch then "came back to the area . . . and parked on . . . the 600 block of Mohr Street[, which] is a side alley off of 4th Street in Allentown." *Id.*, 11/14/22, at 57. Officer Busch exited his police car and walked up to the other officers who were speaking to Esquilin as he stood next to the white Honda Accord. *Id.* Officer Busch, who saw blood on the outside

---

[2] Allentown Police Officer Ariel Vidal testified that the radio call said that the two individuals fighting were male. *Id.*, at 23.

[3] Officer Busch testified that Tilghman Street was approximately one and a half blocks from the scene of the alleged fight. *Id.*, 11/14/22, at 87.

of the Accord and "observed [Esquilin] . . . covered in blood on his side," began to assist the other officers who were treating Esquilin for a stab wound. *Id.* at 59. **See also id.** (Officer Busch testifying Esquilin was wearing white shirt "soaked in blood").

After Esquilin left the scene to be treated by paramedics, Officer Busch received a radio call that someone had discarded a firearm on the roof of an address located on the 600 block of Mohr Street,[4] approximately 50 feet from where Esquilin had been stopped. *Id.* at 62-63. As Officer Busch proceeded "halfway up the alley[, he] observe[d blood] on the ground" outside of a residence located at 626½ North Mohr Street. *Id.* at 64, 82. **See id.**, 11/15/22, at 60 (Allentown Police Officer Todd Sterner, who accompanied Officer Busch to Mohr Street, testifying the officers "saw blood on the roadway, on the street, the pavement, in front of an overhang garage"). A Mohr Street resident then directed Officer Busch to the roof "of a detached garage . . . [where he and Officer Sterner] observe[d] a firearm" that had what appeared to be blood on the handle. *Id.* at 64, 67, 94; *id.* at 83 (Allentown Police Officer Jeffrey Wesneski, part of Crime Scene Identification Unit where he processes crime scenes and makes fingerprint identifications, testifying handle of gun found on Mohr Street garage roof had "reddish-brown stain . . . which [they] suspected could possibly be blood"); *id.* at 101-03 (Officer Wesneski

---

[4] Officer Vidal testified that the houses on the 600 block that front Mohr Street have their backyards and garages on College Street. *Id.* at 11.

testifying he swabbed handle and magazine of gun for DNA evidence that was sent to Pennsylvania State Police Lab for testing).

Lab results revealed that the DNA profile obtained from the blood on the gun was 200 sextillion times more likely from Esquilin than an unknown individual. *See* N.T. Jury Trial, 11/15/22, at 136-40 (Danielle Martzall, an expert in the field of DNA profiling and a forensic DNA scientist with the Pennsylvania State Police Bureau of Forensic Services, testifying swab of handle of gun resulted in partial DNA profile[5] that "included [Esquilin] as a potential contributor to th[e] mixture profile" meaning that "[t]he DNA profile obtained from [the gun] is 200 sextillion times more likely [that] it originated from [Esquilin] . . . [than] an unknown unrelated individual").

At trial, the Commonwealth played a video,[6] marked as Exhibit C-1-B, that showed "the white Honda Accord travelling [and] eventually stopping

_____

[5] While the blood swab of the handle of the gun uncovered two DNA profiles, the other contributor was determined to be "a trace contributor [because n]o further interpretation [could] be made due to an insufficient quantity of DNA from the trace contributor." *Id.* at 140.

[6] After Officer Busch's initial body camera video was played for the jury, the parties and the court had the following sidebar discussion:

> [DEFENSE COUNSEL]:  I want to make sure I understand what is going to be played.  This is just the car driving down, stop, and whatever.  There is no testimony from anybody?
>
> [PROSECUTOR]:  Correct.
>
> [DEFENSE COUNSEL]:  His interactions with anybody?

*(Footnote Continued Next Page)*

_____

[PROSECUTOR]:  Correct.

[DEFENSE COUNSEL]:  No objection to the publishing, Your Honor.

\*     \*     \*

[PROSECUTOR]:  Your Honor, at this time I ask that Officer Busch's body cam that he has reviewed has been marked Commonwealth exhibit C-1-A.  If it may be published at this time to the jury?

[DEFENSE COUNSEL]:  Can I have moment, Your Honor?

THE COURT:  Okay.

\*     \*     \*

[DEFENSE COUNSEL]: So[,] Officer Busch has a body camera that records his interactions at the scene. I believe the Commonwealth wants to play that body camera video which will show[,] I believe[,] Officer Busch interacting with [] Esquilin[,] which captures, I assume, what has been presented about the keys and the other person and the ["]don't touch my car.["]

**I believe also, there is a portion on there of a neighbor who tells the police officers, "Hey, some guy threw a gun on top of the roof."  I believe it goes so far as to give a description of the person.  I did not hear that person listed as a Commonwealth witness, so anything that witness says on the video would be hearsay and would violate the [r]ight to [c]onfrontation.  So[,] I don't want that portion played.**

[PROSECUTOR]: **Your Honor, it is Detective [Nicholas] Lurch that has a long interview and conversation with that witness and I don't intend and that is not a separate part of this video.  The Commonwealth is not going to play that** but when the officer first arrives on that scene, he does see a gentleman with a ladder who makes some motions and it goes to the course of conduct and why they went to where they went. They immediately see the gun on that roof where there is blood on the ground.  If Your Honor wishes to view it [*i*]*n camera*, what I intend to play[,] and then make a ruling, that is fine.

*(Footnote Continued Next Page)*

_____

[DEFENSE COUNSEL]: But[,] it is your representation that witness doesn't say anything?

[PROSECUTOR]: I know he does later[,] that I deleted[,] to Detective Lurch.  On this one[,] I know you can see him but I don't think you can hear or I don't think he says[—]

THE COURT:  Is there any way of stopping the video at a point where a person is about to be speaking?

[PROSECUTOR]:  I don't think you really hear the person speaking in this one.  It is very short.  I edited it.  It is not the whole thing.  But we can fast forward [*i*]*n camera* for Your Honor[,] the portion where he sees another person on the scene.  I don't believe you can really hear anything that he is saying.  It just goes to why the police go to a certain spot and they see blood and they see the gun.

THE COURT:  Okay, so the objection is sustained in part.  The body camera footage is absolutely relevant, but if you can sort of stop it at the point where Officer Busch is concluding any direct interaction with [Esquilin], then start it up again when Officer Busch is going up on the roof. I am trying to understand that chronology.

[PROSECUTOR #2]:  If I see that individual on the video.  I will try to mute that and make sure that[—]it is hard to hear it in the first place but I will mute it in the meantime and when that interaction subsides, we will re[start] the sound.

[PROSECUTOR]:  **I deleted the interview with Detective Lurch that I am going to play later, his interaction with that witness.  But in this one, you can't hear him say anything I don't believe.**

THE COURT: Now, while I have you up here, not to belabor this, did you see this video from before today?

[DEFENSE COUNSEL]:  **I've gotten the videos and I also read through the reports and it also**[—]**they said about editing it and I just wanted to make doubly sure that no statements from third parties who aren't called as witnesses are**

*(Footnote Continued Next Page)*

where someone gets out of the vehicle, gets back into the vehicle [and then] drives off[.]" ***Id.***, 11/14/22, at 70. Officer Busch testified that the vehicle in the video "stops about mid-block down [the alley] and . . . [i]s parked . . . directly to the [right] of the detached garage where the firearm was located [and] where the driver g[ot] out." ***Id.*** at 70-71. ***See also id.***, 11/15/22, at 63 (Officer Sterner testifying video footage shows white Honda Accord stopped "right in front of the garage where the handgun was found [on the roof] . . . [and where] the blood [was on the ground]").[7] Execution of a search warrant for the Accord uncovered a gun holster, gun lock, and a Sar gun box that fit the exact type of gun, a 9mm luger semi-automatic Sarsilmaz,[8] that was

---

> **shown. I hope this is the trimmed[-]down one. That is just my concern.**
>
> THE COURT: Okay. Well, moving forward from today, let's try to get all these kinds of issues addressed because this is the third sidebar in the last 30 minutes and this is going to create a very long trial if we keep going at this pace.

N.T. Jury Trial, 11/14/22, at 71-72, 76-79 (emphasis added). At this point, the court marked and received Commonwealth Exhibit C-1-A into evidence with no objections other than those "which were voiced at sidebar by [defense counsel]." ***Id.*** at 80.

[7] Officer Busch testified "from where [he] viewed the video," he could not see Esquilin holding anything in his hand or throw anything onto the roof of the garage. N.T. Jury Trial, 11/14/22, at 94. ***See also id.*** at 11/15/22, at 179 (prosecutor stating, at sidebar, "Officer Busch is not saying[,] and never did say on the stand[,] that he saw anyone throw anything."); ***id.*** at 180 (same); ***id.*** at 183 (same).

[8] In 2017, AR Firearms (formerly SAR USA Corp.) brought the Turkish Sarsilmaz handguns to the US market[.] AR Firearms the exclusive U.S.
*(Footnote Continued Next Page)*

recovered from the roof of the garage.[9]  *See id.* at 70 (Mark Garrett, an expert in the field of ballistics and toolmark examination of firearms, testifying gun recovered from roof was "a Sarsilmaz, made in Turkey, [that is a] semi-automatic pistol [and t]he caliber [and model] is a 9mm luger").

Allentown Police Detective Lurch was assigned as an investigator and was a Commonwealth witness at trial.  Detective Lurch testified that he met Officer Busch at the Mohr Street address where the gun was recovered.  *Id.* at 175.  On direct examination, Detective Lurch stated that he reviewed the footage from Officer Busch's body camera and "that [it] accurately reflect[ed the situation] when [he] came to the scene[.]" *Id.* at 176.  Immediately after this statement by Detective Lurch, the prosecutor began showing that footage[10] to the detective and the jury.  *Id.*  Defense counsel promptly objected and approached the bench.  *Id.*  At that point, the trial judge ordered that the video be stopped and excused the jury from the courtroom.  *Id.* at 176-77.

Consequently, the following sidebar discussion took place on the record:

THE COURT:  The nature of your objection?

---

importer for all firearms and ammunition products produced by Sarsilmaz Silah Sanayi, a firearms manufacturer based in Istanbul, Turkey.  *See **https://sarusa.com/about-us/*** (last visited on 4/15/24).

[9] Other identifying items found in the white Honda Accord—a Florida driver's license and credit cards—tied the car to Esquilin.

[10] This portion of the body camera video was marked as Exhibit C-1-F at trial.  *See* N.T. Jury Trial (Vol. II), Index to Exhibits, 11/15/22, at 4.

DEFENSE COUNSEL: The nature of my objection, Your Honor, is that the video that was just played contains rank hearsay testimony. Throughout this trial[,] we have tried to be clear on the defense [] because [] the central issue is who had the gun. That was the nature of the questions when the police responded to a radio call that there was a man with a gun. I don't know exactly how [Officer Busch], who is testifying on the camera[,] came about his information that the guy in the fight had the gun and threw it up on the roof. But that is hearsay in the first instance.

In the second instance, it violates my client's right to confrontation because whoever that witness is that allegedly saw that, is not being presented by the Commonwealth for me to cross examine. In the third instance, **I believe that this is prosecutorial misconduct and I would move for a mistrial on that basis.**[11] I cannot unring this bell with an officer testifying that the guy who got stabbed threw the gun on the roof.

\* \* \*

PROSECUTOR: First of all, the officer is not saying he saw it. This is an emergency situation and is explaining a course of conduct

---

[11] We recognize that a defendant must make a timely request for a mistrial under Pa.R.Crim.P. 605(B), and that failure to make a timely request on a specific basis can amount to waiver. *See Commonwealth v. Hernandez*, 230 A.3d 480, 492 (Pa. Super. 2020). Here, Esquilin's counsel undoubtedly made a timely request for a mistrial, objecting immediately after the alleged offending statement was played to the jury. *See* N.T. Jury Trial, 11/15/22, at 176. In addition, counsel gave three reasons for his objection to the video testimony played while Detective Lurch was on the stand. Reading this portion of the above-quoted sidebar, in isolation, it may appear that Esquilin was only moving for a mistrial based on prosecutorial misconduct. However, when read in its entirety, it is apparent that counsel's basis for moving for a mistrial was due to the jury hearing the alleged hearsay testimony from Officer Busch's body camera video where he tells Detective Lurch that a third-party told him the person who got stabbed threw the gun on the roof of the garage. *See* N.T. Jury Trial, 11/15/22, at 178 (defense counsel stating, "I cannot unring this bell with an officer testifying that the guy who got stabbed threw the gun on the roof."). Thus, we decline to find waiver and conclude that Esquilin has preserved his issues for purposes of appeal, having first raised them in the trial court. *Hernandez*, *supra*.

He is saying that someone got stabbed, that a guy threw a gun on a roof. He is not saying ["]I saw it["] or ["]the witness told me.["] I have muted that. That has been tak[en] out. This is the police responding to an emergency situation and a course of conduct.

Officer Busch is not saying and never did say on the stand that he saw anyone throw anything. So[,] it is not being offered for the truth of the matter asserted or saying that[, "]I saw it.["] **He is telling the assigned lead detective why they're there, what happened, what's been going on and what the radio calls w[]ere for.** We have muted the witness.

THE COURT: Who is that person speaking.

PROSECUTOR: Officer [] Busch, who has testified.

THE COURT: This wasn't played before.

PROSECUTOR: This is the second half of this camera that I am authenticating through Detective Lurch upon his arrival at the scene. But Officer Busch testified he never saw anyone do anything.

THE COURT: He testified just to that point. Yet, in this comment now to Detective Lurch, he said the opposite.

PROSECUTOR: Well, he is not saying he saw it.

THE COURT: He's making a conclusion and asserting that.

PROSECUTOR: Right, but he is not saying that he saw it or that ["]the witnesses to[ld] me he saw it.["] He is not saying [any]one saw it. He is telling him the course of events. If Your Honor wishes to give a curative [instruction] or explain that Officer Busch didn't witness it. He is not telling him he saw it; he is explaining to the detective, [while] responding to an emergency situation [of] their course of conduct, what has been going on.

He never said he saw the defendant throw it on the roof. The witness, which he did tell him, ["]told me that he saw him throw it on the roof.[" "]This man over here said he saw the defendant throw it on the roof.["] That is not what he is saying.

THE COURT: And who is that person?

PROSECUTOR: Pardon me?

THE COURT: Who is that person who tells [Officer] Busch that he saw him on the roof?

PROSECUTOR: I mean, he is on here but we muted it.

THE COURT: Who is the alleged witness [] who told [Officer] Busch he saw him throw the gun on the roof?

PROSECUTOR: He is a gentleman that lives in the area, who is afraid to come in.

THE COURT: Who you are not producing?

PROSECUTOR: Correct. So[,] this is being offered for the course of conduct. [Officer] Busch didn't say that ["]someone told me it was on the roof["] or ["]I saw it on the roof,["] he is explaining to Detective Lurch the course of events that led them to where they are.

* * *

DEFENSE COUNSEL: [] But if you want, we can play this back, and the explicit statement from the Officer who did testify on the stand but did not testify to this, and I would have objected then, is ["]the guy who got stabbed threw the gun on the roof.["]

[The court replays the relevant portion of Officer Busch's body camera

video]

DEFENSE COUNSEL: If I may, certainly there is an exception for hearsay when it comes to explaining a course of conduct. There is not, however, an exception to the right to confront the witnesses against my [client, the] defendant. So[,] this goes beyond just a hearsay analysis and also includes a right to confrontation. I don't know who said the guy got stabbed. I can't confront that witness.

PROSECUTOR: Again, I told him it was Officer Busch's cam[era] and Officer Busch testified that he never saw how the gun got up there, nobody saw. I specifically didn't ask Officer Busch about any witnesses he spoke to that may have seen anything. He is relaying information as to why they are going on the roof as their course of action; just like a radio play. Not saying[, "]I saw the

defendant throw it onto the roof. I spoke to a witness that saw it.["] That is not what he is saying in the video.

DEFENSE COUNSEL: But clearly that is the indication.

PROSECUTOR: But I will move on, Your Honor, at this point. We weren't intending on playing the next part or anything that the witness says when you can see him speaking.

THE COURT: You were about to say something else?

DEFENSE COUNSEL: He doesn't have to say ["]I saw it["] or ["]I heard it.["] He says, "The guy that got stabbed had a gun." And then he goes further and said, "He threw it on the roof." He didn't testify to that on the stand, which is perfectly fine. But now, he is testifying on this video about information that violates my client's right to confrontation.

*Id.* at 177-84 (emphasis added).

Following this exchange, the court denied the defense's request for a mistrial, but granted its request to strike the testimony and also told counsel that it would be directing the jury to disregard whatever it heard on the video. *Id.* at 184, 187. When the prosecutor told the trial judge that she was going to "elicit most of the [remaining testimony] through [Detective Lurch] as opposed to the video," the trial judge acknowledged that "[t]hat probably would be a better course of action . . . [because y]ou are on the razor's edge of getting a mistrial right now." *Id.* at 184-85. *See also id.* at 185 (trial judge stating, "I don't believe this falls within course of conduct because it could easily have been explained without playing this video tape. So[,] I don't think it rises to the point of a mistrial yet, but next one, you never know, you might be faced with having a mistrial at this point.").

Subsequently, the jury was brought back into the courtroom, at which time the court gave the following cautionary instruction:

> [A]s we excused you to go to break, there had been an objection. **I have now reviewed what had been objected to and I am instructing you to disregard any of the comments that you heard on the video that was being played.**
>
> That would refer to comments that were supposedly made by Officer Busch and there was a time when he was present but did not testify to the things that you were hearing about on the video tape. **So[,] that is stricken from your consideration in determining if the Commonwealth has proven Mr. Esquilin guilty beyond a reasonable doubt. That is both for during . . . the rest of the testimony[,] as well as in your deliberations.** All right, with that, we can resume with the testimony from Detective Lurch.

*Id.* at 188-89 (emphasis added). Trial resumed and the jury ultimately found Esquilin guilty of the above-mentioned firearms offense. On January 13, 2023, Esquilin was sentenced to five to ten years' imprisonment.

Esquilin filed a timely post-sentence motion claiming that the admission of hearsay statements from Officer Busch's body camera video "deprived [Esquilin] of his constitutional right to confront the witnesses against him" and that a mistrial should have been granted. Post-Sentence Motion, 1/23/23, at 1. The court denied the motion. Esquilin filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following issue for our consideration:

> Whether the trial [c]ourt erred in not granting a mistrial on the basis of improperly admitted statements made in a video presented by the Commonwealth that included accusatory and inculpatory hearsay statements allegedly made by a person not called as a witness at trial[,] thus depriving [Esquilin] of his right

to confront witnesses as guaranteed by the Constitutions of both the United State[s] and the Commonwealth of Pennsylvania.

Appellant's Brief, at 6.

A mistrial "is an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.'" ***Commonwealth v. Hogentogler***, 53 A.3d 866, 878 (Pa. Super. 2012) (citations omitted).

> [T]he review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion.  An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion[,] the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will . . . discretion is abused.  A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

***Commonwealth v. Fortenbaugh***, 69 A.3d 191, 193 (Pa. 2013) (citation omitted).  A mistrial is  not necessary where a court gives a cautionary instruction that is sufficient to overcome any potential prejudice. ***Commonwealth v. Spotz***, 716 A.2d 580, 592-93 (Pa. 1998).  Moreover, the law presumes that a jury will follow the trial court's instructions. ***Commonwealth v. Speight***, 854 A.2d 450, 458 (Pa. 2004).

Esquilin claims that the court erred in not granting a mistrial where hearsay testimony, played via police body camera footage to the jury, violated his fundamental state and federal constitutional right to confront witnesses against him.  Specifically, Esquilin argues that where the jury heard Officer

- 14 -

Busch tell Detective Lurch that "the guy who got stabbed had a gun," he was prejudiced by not being able to test the veracity of the witness who gave the information to Officer Busch. Appellant's Brief, at 11. On appeal, Esquilin claims that he is entitled to a new trial. *Id.* at 12. We disagree.

Upon review of the record, including the brief nature of the offending video testimony played to the jury, we conclude that the court's ruling did not "deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Gilliam*, 249 A.3d 257, 274 (Pa. Super. 2021) (citation omitted). The court's curative instruction, which we presume the jury followed, was "adequate to overcome any possible prejudice," and the court's decision to give the instruction immediately after the jury reconvened following the sidebar, as well as its ruling that sustained the defense's objection and struck the offending video testimony, sufficiently eliminated any prejudice. *See Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014) (citation omitted); *see also Commonwealth v. Simpson*, 754 A.2d 1264, 1272-73 (Pa. 2000) (mistrial unnecessary where cautionary instruction adequate to overcome possible prejudice).

Our conclusion that the jury was not prevented from rendering a true verdict in the instant matter, after hearing the offending comment by the officer, is further supported by the admissible evidence presented by the Commonwealth at trial, including: (1) video footage of Esquilin fleeing the scene of a fight involving a person with gun and a person with machete; (2) Esquilin's car stopping in the alleyway in front of the garage—less than 100

feet from the fight scene—where the gun was found; (3) DNA results indicating that Esquilin's blood was on the recovered gun; (4) when police stop Esquilin's Honda Accord, moments after the gun was thrown onto the garage roof, police notice Esquilin was found to be suffering from a severe stab wound to his side; and (5) a trail of blood from where Esquilin's vehicle stopped to the ground by the garage.

Judgment of sentence affirmed.[12]

_____

[12] Moreover, where the court ruled in Esquilin's favor and struck the offending testimony, Confrontation Clause concerns are not central to the matter. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) (holding when prosecution **seeks to introduce testimonial hearsay into evidence** against a criminal defendant, the Confrontation Clause of the Sixth Amendment requires: (1) that witness who made statement is unavailable; and (2) defendant had prior opportunity to cross-examine unavailable witness); *Commonwealth v. Allshouse*, 36 A.3d 163, 171 (Pa. 2012) (Confrontation Clause prohibits **admission** of out-of-court testimonial statements of unavailable witness that defendant has not had opportunity to cross-examine); *see also Commonwealth v. Williams*, 84 A.3d 680, 684 (Pa. 2014) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.") (citation omitted).

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date:  5/15/2024