J-S08010-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GILBERTO LIBORIO SAGUILAN | : | |
| | : | |
| Appellant | : | No. 449 EDA 2024 |

Appeal from the Judgment of Sentence Entered August 30, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0005930-2020

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.:               **FILED MAY 14, 2026**

Gilberto Liborio Saguilan appeals from the judgment of sentence entered in the Montgomery Court of Common Pleas on August 30, 2023, following his convictions for burglary, 18 Pa.C.S.A. § 3502(a)(1)(i), sexual assault, 18 Pa.C.S.A. § 3124.1, and criminal trespass, 18 Pa.C.S.A. § 3503(a)(1)(i). After careful review, we affirm.

The trial court thoroughly summarized the factual and procedural history of this matter as follows:

> The testimony of the victim of the crimes, viewed in a light most favorable to the Commonwealth as verdict-winner, showed as follows. [**See** N.T., Jury Trial—Day 2, 5/16/23, at 9-49]. One night in August 2020 (in the midst of the COVID-19 pandemic), [the victim] was alone in her high-rise apartment, having earlier finished her shift working at a clinic as a radiation therapist and being off the next day. She had gone through a routine that included saying goodnight by "text" on her phone to her boyfriend, who sometimes stayed over, but not that night, and showering, interrupted only to disconnect a loud alarm going off in her kitchen

that signified a leak from her washer, which she tried to wipe up from the floor.

She had dressed for bed in pajama shorts and a tank top and was having a few sips of whiskey when, close to midnight, [Saguilan], who later told police he had also had several drinks that night, knocked on her door. He had come to the apartment on several prior occasions over the past few months, late at night, she believed on assignment as a handyman for the complex, to check on, but never find, a water leak to the apartment below.

Once when he had come, wearing a mask, in April or May 2020, for this ostensible purpose, her boyfriend had been there, in the bedroom. At some later point, in late May/early June of that year, there had actually been a leak, from the apartment above, but other persons from maintenance at the complex had dealt with the problem.

On the night in question, after spotting [Saguilan], this time with no mask, through the peephole in her door, the victim sent another text to her boyfriend, with whom she had earlier exchanged goodnight wishes, "You'll never guess who's here," [*Id.* at Exhibit C27]. [The victim] let [Saguilan] in, explaining maintenance had previously found and solved a leak. She also showed him remains of the leak in the kitchen from earlier that evening.

[Saguilan] noticed the victim's bottle of whiskey and suggested they have shots, and she obliged. He showed her his tattoo, and said he was the father of the baby of her neighbor, whom the victim knew only as Nicole. He then told the victim he could hear her through the walls of the apartment having sex and it turned him on, which she found weird.

[Saguilan] then proceeded to push [the victim] onto the couch and force himself on her, using strength she could not resist, removing her clothes, and penetrating her vagina with his penis, while she kept saying no and trying to push him off, until she gave up and "tried to just mentally separate myself mentally from what was happening.[*Id.* at 34]." After he stopped, she tried as cordially as she could to ease him out of the apartment, and called her boyfriend, who at first didn't answer because he was asleep.

In the post-assault turmoil she remembered later after reviewing texts extracted from her phone, [that Saguilan] returned to the apartment and kept knocking on the door, while she sent texts to her boyfriend saying she was scared and pressed against the door with her whole body, and that [Saguilan] had a key (which she thought he did). *See id.* Her boyfriend told her to call "911." *Id.* She got her rifle and sat with it until he could come to console her, crying, beside herself, and take her to the hospital.

They first went to a hospital affiliated with her employer. It didn't have the right personnel on hand for her emergency, but did call the police. Meanwhile, due to measures then in effect to battle COVID-19, her boyfriend had to wait outside. The police came and took her to another hospital, where again she had to wait, alone, till morning, for the proper personnel to arrive to perform the tests and procedures for sexual-assault victims.

After the ordeal and its immediate aftermath had run their course, the victim returned to her apartment, but after what had happened, couldn't stay. She started moving out right away.

. . .

Following their investigations, police filed a criminal complaint [on] September 25, 2020. …

The first day of trial proceeded and concluded with the testimony of the Commonwealth's first witness, forensic psychiatrist Barbara Ziv, M.D., who testified on the dynamics of sex-abuse victims' behavior as a "blind expert," [N.T., Jury Trial−Day 1, 5/15/23, at 30], meaning, as she explained, "I don't know any of the facts of this case. I'm not here to talk about any individual, the ... alleged perpetrator or the alleged victim. I'm here to talk about general principles that apply to victims of sexual assault." *Id.* at 30[].

The second day of trial began with the testimony of the victim. The jury then heard from the following witnesses for the prosecution: (1) the occupant of the apartment next to the victim's (the aforementioned "Nicole," [N.T., Jury Trial−Day 2, 5/16/23, at 117], who confirmed she had a child with [Saguilan] and testified he had absented himself from their apartment during the time period of the incident; (2) the victim's boyfriend; (3) a coordinator of maintenance at the apartment complex, who confirmed the apartments had loud alarms to alert residents to

water leaks, and said [Saguilan] had worked for a contractor who did renovations at the complex, but was not authorized to respond to calls for maintenance in the apartments; (4) a forensic scientist for the Pennsylvania State Police (PSP) qualified as an expert, who testified and verified her written report to the effect that DNA (deoxyribonucleic acid) found in vaginal swabs taken from the victim matched [Saguilan]'s unique profile to a very high degree of probability; and (5) the investigating police detective, who spoke to among other things the contents of videos from security cameras showing [Saguilan]'s movements in the complex on the night in question and the statement given to the detective by [Saguilan] before either knew the results of the DNA analyses, admitting he had gone into the victim's apartment that night, at her invitation he said, to check on a water leak, and had drinks with her, but denying he had ever been in the apartment before or that he had had any sexual contact with her.

Trial resumed on the third day with defense counsel's cross-examination of the detective. The Commonwealth then presented its remaining witnesses: (1) a PSP serologist qualified as an expert, who testified and substantiated his report as to the contents of various swabs taken from the victim and her apartment, which were then provided to the DNA analyst; and (2) the sexual-assault nurse examiner ("SANE") who interviewed and examined the victim at the emergency room after the incident, collected various swabs for analysis, and prepared a chart/report of her findings. The SANE's testimony and written report about the victim's statements made during the interview and exam corroborated many of the details of the incident the victim testified to at trial.

The Commonwealth rested and the defense case began. But first the jury retired while the [c]ourt and [Saguilan] had a colloquy about his decision not to testify.

The jury then returned to the courtroom to hear the defense's case, which comprised three character witnesses: (1) Nicole, recalled as a witness for the defense; (2) [Saguilan]'s younger sister; and (3) his older sister. Defense counsel and the prosecutor then gave closing arguments, with the defense maintaining before the jury that [Saguilan]'s sexual encounter with the victim was consensual, and the prosecutor stressing the evidence to the contrary.

- 4 -

The Court instructed the jury, and it retired to deliberate. …

The jury found [Saguilan] guilty of the charges [] of criminal trespass, sexual assault, and burglary. They found him not guilty of rape by forcible compulsion.

Trial Court Opinion, 5/19/25, at 1-8 (some record citations omitted).

On August 30, 2023, the court sentenced Saguilan to an aggregate term of 58 to 116 months' incarceration, to be followed by 3 years' probation. Saguilan filed a post-sentence motion challenging the weight of the evidence, which the court denied.

Saguilan filed a timely notice of appeal with this Court on January 30, 2024, and on February 2, 2024, the trial court directed Saguilan to file and serve a concise statement of errors complained of on appeal in accordance with Rule 1925(b) within twenty-one days of the date of the order. The trial court explained that "any issue not properly included in a statement timely filed and served pursuant to Pa.R.A.P. 1925(b) shall be deemed waived." Order, 2/2/24 (internal quotation marks omitted). Saguilan filed a Rule 1925(b) statement raising nine issues on February 22, 2024.

Preliminarily, we acknowledge that the trial court asserts that Saguilan failed to perfect and prove timely service on the trial court of the 1925(b) concise statement, and therefore argues his issues should be deemed waived. *See id.* at 27-30.

Rule 1925 provides, in relevant part, that:

If an appellant represented by counsel in a criminal case was ordered to file and serve a Statement and either failed to do so,

- 5 -

> or untimely filed or served a Statement, such that the appellate court is convinced that counsel has been *per se* ineffective, and the trial court did not file an opinion, the appellate court may remand for appointment of new counsel, the filing or service of a Statement *nunc pro tunc*, and the preparation and filing of an opinion by the judge.

Pa.R.A.P. 1925(c)(3). However, "[w]hen counsel has filed an untimely Rule 1925(b) statement[,] and the trial court has addressed those issues[,] we need not remand and may address the merits of the issues presented." ***Commonwealth v. Thompson***, 39 A.3d 335, 340 (Pa. Super. 2012) (citation omitted).

As stated previously, the trial court issued an order on February 2, 2024, requiring Saguilan to file a Rule 1925(b) statement and serve the same upon the trial court within twenty-one days. Notably, the order specified that service of the statement should be made "upon the undersigned Judge either in person to the mail room at the Montgomery County Courthouse or by mail to P.O. Box 311, Court House, Norristown, PA 19404." Order, 2/2/24. The court warned that a failure to timely file and serve the statement would result in waiver of any issue raised therein. The docket indicates this order was served on the parties the same day it was filed, by "eService."

Upon review of the record, the docket entry for the Rule 1925(b) statement is on "02/24/2024", and indicates a service date of "2/23/2024" by "eService." The Rule 1925(b) statement itself bears a timestamp indicating it was filed with the clerk of courts on February 22, 2024. The certificate of

service attached to the statement indicates that service was provided via "[PACFile][e-mail]."

Based on the above, it is clear the Rule 1925(b) statement was timely filed, but that service was not perfected in the form requested by the trial court. Nevertheless, the court addressed all issues raised in a Rule 1925(b) statement in a notably staggering, almost 100-page opinion. Accordingly, we need not remand for a supplemental Rule 1925(a) opinion, and this matter is ripe for disposition.

On appeal, Saguilan raises the following 5 issues for our review:

1. Whether the trial court erred in permitting Dr. Ziv to testify beyond her scope as an expert witness when she directed the jury to disregard certain evidence?

2. Whether the trial court erred in permitting Dr. Ziv to provide statistical testimony that implicitly bolstered the complainant's credibility?

3. Whether the trial court erred in denying a mistrial after the prosecutor twice made an inflammatory assertion that Saguilan was a "rapist"?

4. Whether the evidence was insufficient to prove criminal trespass where the complainant voluntarily permitted [Saguilan] to enter?

5. Whether the evidence was insufficient to prove burglary where the Commonwealth failed to prove intent at the moment of entry?

Appellant's Brief, at 5 (trial court's answers omitted).[1]

_____

[1] Saguilan raised 9 issues in his 1925(b) concise statement, (1) through (4) challenging the court's admission or exclusion of evidence at trial, (5)
*(Footnote Continued Next Page)*

- 7 -

In his first two issues, Saguilan argues the trial court erred in permitting Dr. Ziv to testify beyond her scope as an expert witness, particularly as to the credibility of the victim. **See** Appellant's Brief, at 12, 15.

In reviewing a challenge to the trial court's discretion in allowing expert testimony, we are mindful of the following:

> The standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. A witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on training and experience.
>
> Expert testimony is permitted as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. Conversely, expert testimony is not admissible where the issue involves a matter of common knowledge.

**Commonwealth v. Smith**, 206 A.3d 551, 560 (Pa. Super. 2019) (citations and quotation marks omitted).

_____

challenging the court's denial of a motion for a mistrial, (6) challenging the court's overruling of a defense objection to a comment made by the Commonwealth during closing arguments, (7) and (8) challenging the sufficiency of the evidence, and (9) challenging the court's denial of a motion for a new trial based on the weight of the evidence. Saguilan has abandoned many of these issues on appeal, namely two of the evidentiary challenges, the challenge regarding the Commonwealth's closing argument, and the final issue challenging the court's denial of a new trial. As such we find these claims waived for appellate review.

Generally, the admission of expert testimony is governed by Pennsylvania Rule of Evidence 702, which provides:

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

However, expert testimony in a criminal proceeding implicating sex offenses is specifically governed by 42 Pa.C.S.A. § 5920, which provides:

**(b) Qualifications and use of experts**.—

(1) In a criminal proceeding subject to this section, a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence, that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

42 Pa.C.S.A. § 5920(b)(1)-(3).

Here, the Commonwealth sought to qualify Dr. Ziv as an expert witness in sexual abuse dynamics and in victim behavior pursuant to Section 5920(b)(1). *See* N.T., Jury Trial–Day 1, 5/15/23, at 29. After the Commonwealth completed *voir dire* of Dr. Ziv, defense counsel chose not to ask any further questions about her credentials, areas of expertise, or her report. *See id.* Accordingly, the court found that Dr. Ziv could "give an opinion on sexual abuse and the dynamics that results therefrom." *Id.* at 29-30. Notably, Saguilan did not object to Dr. Ziv's qualification as an expert witness at trial, nor has he raised a challenge to her qualification as an expert on appeal. Instead, Saguilan contends Dr. Ziv testified outside of the scope of permissible expert testimony.

The Commonwealth initially had Dr. Ziv explain what it meant that she was testifying as a "blind expert." *Id.* at 30. Dr. Ziv explained that she did not know any of the facts of this case, and was not there to talk about any particular individual, i.e., the alleged perpetrator or the alleged victim. *See id.* Dr. Ziv confirmed she had not read any interviews, statements, or police reports from the case. *See id.* Instead, Dr. Ziv explained she was there to talk about "general principles that apply to victims of sexual assault." *See id.*

Dr. Ziv went on to explain that "many adults if not most adults have ideas about how they perceive victims would behave in the case of sexual assault," which she categorized as "rape myths." *Id.* at 31.

- 10 -

In his first issue, Saguilan takes issue with Dr. Ziv's testimony that followed, in which Dr. Ziv expounded on those "rape myths":

Most of what people who are not experts in the field believe about the way victims would behave is wrong.

For example—and so there are a wide variety of rape myths. For example, most people think that sexual assault is perpetrated by a stranger. That is not true. Eighty-five percent of all sexual assault is perpetrated by somebody who is known to the victim.

Another common rape myth is that victims would fight back physically or verbally screaming, right? That's what you see on TV, that's what you see in the movies. That's not true. In fact, studies have shown that physical resistance in cases of stranger rape—and even in cases where an individual is raped by more than one perpetrator—physical resistance, in terms of strong—fighting back physically, is rare, occurring in approximately 15 percent of the cases.

Similarly, screaming, loud verbal resistance, screaming, yelling, calling for the police, saying "help" is also rare; it occurs in less than half of the cases in cases of stranger sexual assault, stranger rape.

So, by inference, although the studies on, you know, these kinds of resistance in acquaintance sexual assault are not as robust, not as—it is much less, it's rare. People don't scream. Occasionally they might, occasionally they might fight back. But the majority of people don't.

So those kinds of factors should not be part of the equation when one's assessing what happened because—

*Id.* at 31-32. Defense counsel then objected. When asked for the basis of the objection, defense counsel stated "[b]eyond the scope." *Id.* at 32. The court overruled the objection. *See id.* at 33. Dr. Ziv then continued:

So victim behavior—so people—so how do victims behave? And, in fact, there have been over a hundred different kinds of

behaviors that individuals have demonstrated during and after—before, during, and after a sexual assault.

There is a wide variety of victim behavior and there is no typical pattern—there is no typical pattern of behavior, except to say that most people, most women—and what I'm talking about here, I'm talking about female victims—this does apply to both female victims and male victims as well as children, but a lot—much of the research that I'm talking about is conducted on female victims.

So most female victims do not fight back. Most people—female victims do not scream.

*Id.*

A review of the above testimony shows that Dr. Ziv did not testify regarding this victim specifically or whether or not the alleged incidents actually occurred. Dr. Ziv did not offer any opinion regarding the victim's credibility; nor could she, as she had not received any information about this particular case, either prior to trial, or during trial—as she was the first witness to testify. Accordingly, Dr. Ziv's generalized testimony regarding victim's responses to sexual assault was clearly admissible under Section 5920.

Next, Saguilan takes issue with a portion of Dr. Ziv's testimony on cross-examination. Specifically, when asked by defense counsel if she agreed that there are instances of false accusations of sexual assault, Dr. Ziv responded

False accusations of sexual assault occur with about the same frequency of false allegations of any crime. It's somewhere between two and eight percent. It's relatively rare. And that occurs in all crimes.

*Id.* at 42. Defense counsel then continued to question Dr. Ziv about false accusations, including potential motives and responses thereto. ***See id.*** at 42-

- 12 -

44. After a short re-direct, Dr. Ziv's testimony was concluded and the first day of trial was concluded shortly thereafter.

The next day, before the jury was brought in for the second day of trial, defense counsel belatedly attempted to lodge an objection to Dr. Ziv's testimony in response to defense counsel's own question on cross-examination from the prior day that false accusations only exist in "between two and eight percent" of cases. *See* N.T., Jury Trial–Day 2, 5/16/23, at 5. Defense counsel noted the basis for his objection was that it was

> beyond the scope of the expertise of the expert witness. That it also calls for the ultimate question, which would be the credibility which is left to the fact finder, which is not within the province of the expert witness because, essentially, she's saying, well, since false accusations only occur in two to eight percent of the cases, the complainant in this case would be honest 92 to 98 percent of the time.

*Id.* at 5-6. Defense counsel stated he would either make a motion for a mistrial or a motion for a curative instruction, and offered that he would draft a proposed curative instruction. The trial court highlighted that Dr. Ziv was "a blind expert who was not given any factual statement about this case," and "was just giving, in her opinion, statistics that were born out of data collected as far as in her expertise." *Id.* at 7. Accordingly, the court denied counsel's request for a mistrial, but stated it would reconsider the motion for a mistrial if it later found that Dr. Ziv's testimony had prejudiced the jury. *See id.* Later that day, the court brought up this issue again, and ruled that it was not going to give a curative instruction, reasoning as follows:

> Dr. Ziv had not—she was not testifying about the specifics of this case … She was only giving what she believed was statistical data on the percentage of people—victims of sexual assault. And therefore, I do not find that she has usurped the role of a jury in basically stating what the facts are. I think at best her testimony was what she has found in her research.

*Id.* at 93.

Our review of the record shows that the defense's objection to Dr. Ziv's testimony, made a day after the challenged testimony, was untimely. In fact, at the time of the objection, defense counsel recognized the lapse of time between the testimony and the objection, noting that during Dr. Ziv's testimony "yesterday," some statistics were elicited on direct examination, (which were also not objected to), and then noting that on cross-examination, defense counsel himself asked Dr. Ziv a question about false accusations to which she "blurted out a statistic." *Id.* at 5. Defense counsel stated the question had been "a simple yes or no question," despite never correcting Dr. Ziv as to such the day before, and despite continuing to press her on the same topic immediately following the challenged testimony.

Based on the above, we find Saguilan failed to preserve an objection to the challenged testimony by failing to object contemporaneously with the testimony. In any event, we agree with the trial court that Dr. Ziv was giving general statistical data on the topic she was qualified to testify to, in direct response to defense counsel's question. Accordingly, Saguilan is not entitled to relief on either of his first two issues.

In his third issue, Saguilan argues the trial court erred in denying his motion for a mistrial based on prosecutorial misconduct. Upon the making of the motion for mistrial, the trial court is to "determine whether misconduct or prejudicial error actually occurred, and if so, to assess the degree of any resulting prejudice."[2] *Commonwealth v. Sanchez*, 907 A.2d 477, 491 (Pa. 2006) (citation omitted). "The remedy of a mistrial is an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.'" *Commonwealth v. Hogentogler*, 53 A.3d 866, 878 (Pa. Super. 2012) (citations omitted).

A trial court is vested with the sound discretion to determine whether a mistrial is warranted, and we review its decision for an abuse of that discretion. *See id*.

> An abuse of discretion is more than an error of judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

---

[2] We note Pennsylvania Rule of Criminal Procedure 605 addresses mistrials, and provides, in pertinent part, as follows:

**Rule 605. Mistrial**

**(B)** When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial court may declare a mistrial only for reasons of manifest necessity.

Pa.R.Crim.P. 605(B).

*Commonwealth v. Hudson*, 955 A.2d 1031, 1034 (Pa. Super. 2008) (citation omitted).

Moreover, a trial court may remove taint caused by improper testimony through curative instructions. *See Commonwealth v. Bracey*, 831 A.2d 678, 682 (Pa. Super. 2003). When the trial court provides cautionary instructions to the jury after the defense raises a motion for a mistrial, "[t]he law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 786 A.2d 961, 971 (Pa. 2001) (citation omitted).

Saguilan asserts the Commonwealth "twice made an inflammatory assertion that he was a rapist" during the following pertinent exchange on cross-examination of Saguilan's sister, the final witness of the trial:

[Commonwealth:] Where do you work?

[Sister:] In a church.

[Commonwealth:] In a church?

…

[Sister:] A Christian church.

[Commonwealth:] A christian church, okay. What do you do there?

[Sister:] I organize events. Like every third Saturday of the month[,] we do like [an] event for kids and the community. Like this month is Mother's Day. We're going to do the event and we're going to have gift for every mom in the community.

[Commonwealth:] Would your brother being a rapist hurt your reputation in that church?

[Defense counsel]: Objection.

- 16 -

[Commonwealth]: It goes to bias, Your Honor.

[Defense counsel]: It's prejudice.

THE COURT: Would you restate the question, please, [Commonwealth]?

[Commonwealth]: Would your brother being a rapist hurt your reputation at that church?

[Defense counsel]: Objection. Same question.

THE COURT: Yes. I'm going to sustain the objection.

N.T., Jury Trial–Day 3, 5/17/23, at 85-86. Following a brief side bar in chambers, the court reiterated that it was sustaining the objection, noting there was no response, but it was going to strike the question from the record. *See id.* at 86-87. The defense then rested its case. After the jury exited for a break before closing arguments, defense counsel made a motion for a mistrial based on the above question by the Commonwealth. *See id.* at 88-89. Defense counsel explained the reasoning as follows:

> You know, I think it was unfairly—extremely unfairly prejudicial, and the way the question was posed was not something to the— which we hear a lot of times, you know, someone being accused of this or these allegations, but it was, "Would the defendant being a rapist hurt your reputation at the church?"
>
> To me it can inflame the passions of the jury because it can put in their mind one or two things. While either—it's almost as though he's already been convicted of it. And if he hasn't been convicted of it here because sitting over there and he's presumed innocent, well, does he have any prior conviction as a rapist?
>
> So I think it misleads the jury. I think it inflames the jury's passions. And, quite frankly, I'm not sure this is something that

they will be able to get past and look fairly and neutrally and impartially at the evidence.

*Id.* at 89 (unnecessary capitalization omitted). The Commonwealth responded that the court's recollection controlled but that it believed it "said if, talking about in the future," and that it "thought it was a fair question regarding the witness's bias about why she's testifying here today on behalf of her brother." *Id.* at 89-90. However, the Commonwealth noted an instruction by the court would cure any potential defects. *See id.* The Commonwealth highlighted that Saguilan was on trial for rape, so the use of the term "rapist" was not going to inflame the jury where "[t]he whole case is about rape." *Id.* at 90. The court indicated that it had stricken the question from the record because the court believed the question was improper, but acknowledged that the jury would not have been surprised by the use of the term "rapist" since one of the charges was rape of the victim. *See id.* at 91. The court took the matter under advisement to consider if a mistrial were warranted. *See id.* at 92. After returning to the record later that day, the court ruled it was denying the motion for a mistrial and instead was going to give a curative instruction when the jury came out. *See id.* at 94. The jury was then brought out and the court immediately instructed them pertinently as follows:

> THE COURT: Before I have the attorneys give their closing arguments, I want to bring something to your attention.
>
> The last witness that was called by [defense counsel] was Miss Rosa Saguilan. During cross-examination by [the Commonwealth], a question was asked about [Saguilan] being a rapist. That was an improper question. And as I stated to you all

at the early stages of this trial that questions by counsel [are] not evidence. I said to you only the answers that you hear that you can consider as evidence. And that same thing applies here. But just the question I want to tell you, you are not to consider that question when you are deliberating. It should not even come out of your mouths. It's as if it wasn't asked.

The question of whether or not [Saguilan] committed this crime it is totally up to you.

As I told you earlier, I decide all legal issues. But as far as the facts, you are the sole judges of the facts, and only you will determine whether or not he committed the rape as charged by the Commonwealth. He still sits here an innocent man until proven guilty.

So it was unfortunate that the question came out, but it did, and you heard it and you all nodded when I said that, so I know you all heard it. Ignore it, all right?

THE JURY: Yes.

*Id.* at 96-97.

The curative instruction correctly and appropriately directed the jurors on how to disregard the question presented by the Commonwealth. There is no evidence that the jury ignored the trial court's cautionary instructions directing the jury to ignore the question completely. Absent evidence to the contrary, the jury is presumed to have followed the trial court's instruction. *See Brown*, 786 A.2d at 971. Notably, it would appear the jury was not affected by the question as they found Saguilan not guilty of the rape charge. Based on the above, we agree with the trial court's decision that an order for a mistrial was unnecessary. Therefore, we discern no abuse of discretion by

- 19 -

the trial court in denying Saguilan's motion for a mistrial. Accordingly, this issue does not merit relief.

In his final two issues, Saguilan challenges the sufficiency of the evidence supporting his convictions for criminal trespass and burglary. Our standard of review for a challenge to the sufficiency of the evidence is as follows:

> The determination of whether sufficient evidence exists to support the verdict is a question of law; accordingly, our standard of review is *de novo* and our scope of review is plenary. In assessing [a] sufficiency challenge, we must determine whether viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth], there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. ... [T]he finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

***Commonwealth v. Edwards***, 177 A.3d 963, 969-70 (Pa. Super. 2018) (quotation marks and citations omitted).

An individual commits the offense of criminal trespass if, "knowing that he is not licensed or privileged to do so, he: (i) enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof...." 18 Pa.C.S.A. § 3503(a)(1)(i).

Saguilan argues the evidence shows that he knocked on the victim's door, the victim looked through her peephole, opened the door, and voluntarily let him inside. ***See*** Appellant's Brief, at 24. Saguilan argues that

because the victim voluntarily let him inside the Commonwealth could not prove that he "knew" he lacked privilege to enter. *Id.*

With respect to any possible license to enter, the jury heard testimony from the victim that on the night in question an alarm from a water detector went off in her apartment and that a leak was evidenced by a puddle near her washer and dryer. *See* Jury Trial—Day 2, 5/16/23, at 12. The victim testified that she had been drinking whiskey and relaxing in her apartment alone. *See id.* at 13. At around 11:30 to midnight someone knocked on the victim's door, and she recognized the person as Saguilan when she looked through the peephole. *See id.* at 18. The victim recounted that there were at least two other times in the previous few months that Saguilan knocked on her door late at night indicating he was a maintenance worker checking for a leak and that he would enter and look in the kitchen and under the sink for a leak he never found. *See id.* at 19. Saguilan specifically told the victim he was a maintenance man and she believed him. *See id.* On the night in question, the victim opened the door and told Saguilan that she found the leak he was looking for, he went and looked at where the leak was, and they continued to talk about the leak. *See id.* at 27-28. The conversation subsequently got weird when Saguilan told the victim he could hear her having sex through the walls and it turned him on, which made the victim uncomfortable. *See id.* at 30. The next thing she knew he was ripping off her clothes and holding her wrists

down and pushing her into the couch, and eventually put his penis into her vagina. ***See id.*** at 31-32.

Further, the maintenance coordinator for the building at the time of the incident testified that he knew Saguilan because he worked for a contractor that previously did renovations at the building, specifically larger scale projects that the general building maintenance team did not handle. ***See id.*** at 153. The contractor company did not respond to work orders and did not work after hours. ***See id.*** Despite Saguilan gaining entry to the victim's apartment based on performing maintenance, the maintenance coordinator testified that Saguilan did not work for the maintenance department of the building and was not permitted to go to any apartments on behalf of the maintenance department, including to check for leaks. ***See id.***

Viewing the evidence and all the inferences derived therefrom in the light most favorable to the Commonwealth as verdict winner, we have little difficulty in determining that the evidence was sufficient for the jury to reasonably conclude that Saguilan gained entry by subterfuge. ***See*** 18 Pa.C.S.A. § 3503(a)(1)(i). Accordingly, the evidence was sufficient to find Saguilan guilty of criminal trespass.

Next, an individual commits the offense of burglary where, "with the intent to commit a crime therein, the person: (1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any

person is present and the person commits, or attempts or threatens to commit a bodily injury crime therein." 18 Pa.C.S.A. §§ 3502(a)(1)(i).

Therefore, "[t]o prevail on a burglary charge, the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises with the contemporaneous intent of committing a crime therein, at a time when he or she was not licensed or privileged to enter." *Commonwealth v. Sanchez*, 82 A.3d 943, 972 (Pa. 2013) (citations omitted). "Any license or privilege to enter a premises is negated when it is acquired by deception." *Id.* (citations omitted). We further determine intent by the totality of the surrounding circumstances. *See Commonwealth v. Magnum*, 654 A.2d 1146, 1147 (Pa. Super. 1995). "Often, intent cannot be proven directly but must be inferred from examination of the facts and circumstances of the case." *Commonwealth v. Willetts*, 419 A.2d 1280, 1281 (Pa. Super. 1980) (citations omitted).

Saguilan essentially makes the same argument against both of the above convictions: that he knocked on the victim's door, the victim looked through her peephole, recognized Saguilan, opened the door, and voluntarily let him inside. *See* Appellant's Brief, at 25. Saguilan argues that there was no evidence of deception. *See id.* As discussed above, we disagree.

Similar to our discussion above, viewing the evidence and all the inferences derived therefrom in the light most favorable to the Commonwealth, we have little difficulty in determining that the evidence was

sufficient for the jury to reasonably conclude that Saguilan entered the victims' apartment through deception, with the intent to commit a crime therein.

From the same evidence detailed above, the jury could reasonably have concluded that, by leading the victim to believe he was there for professional reasons of checking on a maintenance issue, Saguilan gained unprivileged entry by deception. The jury could have reasonably inferred that, had the victim known Saguilan was not there to help with the leak, she would not have allowed him into her apartment, especially that late hour of the night. With regard to intent to commit a crime, the jury could have inferred intent from Saguilan's sustained use of deception to gain entry to the victim's apartment; Saguilan's uncomfortable statement to the victim that he was turned on by listening to her having sex through the wall of the neighboring apartment; and that he showed up after drinking himself, and suggested they continue drinking together, and made himself comfortable on her couch to do so.

Under the totality of the circumstances, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we conclude the evidence was sufficient for the jury to conclude Saguilan had the intent to commit a crime upon entering the victim's apartment. **See Magnum**, 654 A.2d at 1147.

As none of Saguilan's issues merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2026